# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 74136-5-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| AKEEM NURUDDIN HENDERSON, | |
| Appellant. | FILED: February 16, 2016 |

APPELWICK, J. — Henderson was convicted of two counts of felony harassment, two counts of obstructing law enforcement, three counts of unlawful possession of a controlled substance, unlawful possession of a firearm in the first degree, escape in the third degree, and driving with a suspended license. The court imposed a firearm enhancement on the three unlawful possession counts. Henderson contends that the trial court violated his right to counsel twice. He argues that there was insufficient evidence to convict him of felony harassment and to impose the firearm enhancements. He asserts that the prosecutor committed misconduct on three occasions. He challenges the constitutionality of the unlawful possession statute, RCW 69.50.4013. He contests the LFOs the court imposed. In a statement of additional grounds, Henderson challenges the search warrant, claims the trial court erred by not giving him an evidentiary hearing, and asserts that the police and prosecutor committed misconduct. We affirm.

## FACTS

On March 8, 2014, Officers Tyler Meeds, Shane Wimbles, and Joshua Boyd, and Community Corrections Specialist Thomas Grabski went to 811 South Cushman Street, Apartment B in Tacoma. They were acting on information that Akeem Henderson lived at that location and had a warrant for his arrest. Several officers knocked on the front door of the apartment. Henderson opened the door, and the officers placed him under arrest. Officer Meeds escorted Henderson to his police vehicle.

As Officer Meeds and Henderson approached the patrol car, Henderson ran away from the police officers. The officers ordered him to stop. Henderson fell, and the officers were able to take him back into custody.

The officers placed Henderson in Officer Boyd's patrol car to be transported to Pierce County Jail. On the way to the jail, Henderson made several statements boasting about his status as a drug dealer. Henderson also told Officer Boyd that he came to the door holding a fully loaded "Sig .40" (Sig Sauer .40 caliber handgun). He told Officer Boyd two or three times that he should have blasted the officers when they came to the door. Henderson stated several times that the next time those officers came to his door, he would blast them.

Several days later, on March 12, 2014, Officers Meeds, Wimbles, and Boyd, and Specialist Grabski returned to the apartment to execute a search warrant. Because of Henderson's previous threats, the officers waited for Henderson to leave the apartment before serving the search warrant.

2

In the master bedroom, the officers found numerous receipts with Henderson's name on them and letters addressed to him. Henderson's employee identification (ID) card was on the dresser. Under the mattress, the officers discovered a Sig Sauer .40 caliber handgun. And, the officers found a baggie containing pills in a jacket hanging in the closet.

Henderson returned to the apartment while the officers were still present. The officers arrested him.

Henderson was charged with three counts of felony harassment, escape in the third degree, two counts of obstructing a law enforcement officer, assault in the third degree, unlawful possession of a firearm in the first degree, three counts of unlawful possession of a controlled substance, and driving while in suspended or revoked status in the third degree.

Henderson represented himself at trial. He was convicted on all counts except one count of felony harassment and one count of assault in the third degree. And, the jury found that Henderson was armed with a firearm during the commission of the drug possession offenses. The trial court imposed a firearm enhancement on the drug possession counts. Henderson appeals.[1]

DISCUSSION

I. Right to Counsel

Henderson argues that the trial court violated his right to counsel twice. He first contends that the trial court failed to inquire into the breakdown of

_____

[1] Henderson filed a motion in this court on December 21, 2015. It fails to identify a basis on which relief could be properly granted and is therefore denied.

communication with his attorney. And, he argues that the trial court again failed to inquire when it appointed the same attorney to be standby counsel when Henderson proceeded pro se.

A criminal defendant has the right to represent himself at trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. But, courts must indulge in every reasonable presumption against the defendant's waiver of the right to counsel. State v. Madsen, 168 Wn.2d 496, 504, 229 P.3d 714 (2010). If a defendant requests to proceed pro se, the trial court must first determine if the request is both unequivocal and timely. Id. If it is both, then the court must determine that the request is voluntary, knowing, and intelligent. Id.

We review trial court decisions relating to attorney-client differences for abuse of discretion. State v. Cross, 156 Wn.2d 580, 607, 132 P.3d 80 (2006).

A.    Inquiry into Breakdown in Communication

Henderson argues that the trial court erred by failing to inquire into whether there was a breakdown in communication between Henderson and his attorney.

Henderson first expressed dissatisfaction with his legal representation in a letter to the court that was filed on September 18, 2014. In this letter, Henderson asserted that his attorney had walked out on their meeting on August 2 and had not talked to him since then, and he refused to file any of the motions Henderson wanted to file. Henderson asked the court to appoint effective counsel. The record does not show that the trial court replied to this letter.[2]

---

[2] At oral argument, Henderson asserted that, in fact, the trial court did respond to this letter before the October 6 hearing. According to Henderson the

4

On October 6, 2014, Henderson appeared before the trial court and moved to proceed pro se. He explained, "I want to proceed pro se and handle my case I think for the best interest for myself and the motions that I'd like to put in to handling my case." The court asked Henderson a lengthy series of questions about his knowledge of the law, the time frame, and the expectations for a pro se defendant. The court specifically asked Henderson why he did not want an attorney. Henderson replied that he had a lot of motions he wanted to file, but his attorney would not file them. Henderson believed that he was the only one who cared about his case. The trial court then advised Henderson that he would be better defended by a trained lawyer. Henderson responded by again emphasizing the motions he wished to file. And, his appointed counsel indicated that Henderson had been wanting to represent himself for some time. Henderson confirmed for the court that his decision was 100 percent voluntary. As a result, the court found that Henderson knowingly and voluntarily waived his right to counsel. The trial court ordered that Henderson would represent himself pro se and the Department of Assigned Counsel (DAC) would provide standby counsel.

In arguing on appeal that his right to counsel was violated, Henderson relies largely on United States v. Adelzo-Gonzalez, 268 F.3d 772 (9th Cir. 2001). He asserts that under Adelzo-Gonzalez, the trial court was required to inquire into Henderson's breakdown in communication with his attorney, even though he did not bring a motion for substitute counsel or raise these issues during the October

court sent him a letter telling him that it would not consider his argument. But, the record before us does not contain such a letter.

6 hearing. But, the facts of <u>Adelzo-Gonzalez</u> are distinguishable. There, the defendant wrote three letters to the court, which the district court decided to treat as motions for substitution of counsel.[3] <u>Id.</u> at 777. Accordingly, the court provided Adelzo-Gonzalez with three opportunities to argue these motions at hearings. <u>Id.</u> at 774-75. At these hearings, the defendant attempted to articulate the problems he had with his appointed counsel, but the court asked only open-ended questions. <u>Id.</u> at 774-75, 777. The Ninth Circuit ruled that in Adelzo-Gonzalez's case, open-ended questions were insufficient to ascertain the extent of the breakdown in communication. <u>Id.</u> at 777. And, given the defendant's statements and his appointed counsel's responses during the inquiries, there were compelling reasons to more fully examine Adelzo-Gonzalez's claims. <u>Id.</u> at 778.

But, unlike in <u>Adelzo-Gonzalez</u>, Henderson did not move to substitute his appointed counsel. The court did not treat Henderson's letter as a motion for substitute counsel. And, Henderson did not again raise his issues with appointed counsel before the court. Instead, Henderson pursued a different remedy: he asked to represent himself.[4] Henderson told the court that he disagreed with his

---

[3] We note that <u>Adelzo-Gonzalez</u> does not state that the trial court was required to treat these letters as motions. In fact, Adelzo-Gonzalez's letters to the court were not part of the record in that appeal. <u>Adelzo-Gonzalez</u>, 268 F.3d at 777. Consequently, the Ninth Circuit examined the issues Adelzo-Gonzalez raised orally before the court at a hearing, rather than what he asserted in the letters to the court. <u>Id.</u> Here, the trial court did not treat any letters as constituting written motions.

[4] Henderson asserts that his right to counsel was violated, because he elected to proceed pro se after the trial court failed to inquire into the breakdown in communication. But, the trial court never denied a motion to substitute counsel. Henderson never made such a motion. Instead, Henderson made only a motion to represent himself.

appointed counsel's trial strategies—he wanted to file motions that his attorney would not file. The trial court engaged in an adequate colloquy with Henderson to determine that his waiver of his right to counsel was knowing, voluntary, and intelligent. Henderson confirmed multiple times that he understood what his decision entailed and wanted to represent himself.

The court had no duty to inquire whether there had been a breakdown in communication with counsel, when he did not file a motion to substitute counsel or raise the issue at a hearing. Moreover, Henderson unequivocally expressed his request to represent himself at trial. Such a request is valid, even if combined with an alternative request for new counsel. See Madsen, 168 Wn.2d at 507. We hold that the trial court did not abuse its discretion when it did not inquire into Henderson's relationship with appointed counsel before granting his request to proceed pro se.

B.     Standby Counsel

Henderson also argues that the trial court violated his right to counsel by appointing the same attorney as standby counsel when Henderson proceeded pro se, and by failing to inquire into their breakdown in communication.

This argument is unsupported by the record. After the trial court ruled that Henderson could represent himself at trial, it noted that it would ask the DAC to assign standby counsel for Henderson. The prosecutor asked if the court intended Henderson's appointed counsel to stay on as standby counsel, to which the court replied, "I don't have any intent. I just -- it's up to DAC." The record does not contradict this assertion. Thus, the trial court could not have violated Henderson's

7

right to counsel by appointing standby counsel, because the court was not responsible for this decision.

Still, Henderson asserts that the court should have inquired into his breakdown in communication with his standby counsel when he wrote a letter to the court about the situation. But, he did not file a motion. And, different rules apply to standby counsel than to appointed counsel. A pro se defendant does not have an absolute right to standby counsel. State v. DeWeese, 117 Wn.2d 369, 379, 816 P.2d 1 (1991). Nor does the Sixth Amendment provide the right for a pro se defendant to serve as co-counsel with his attorney. Id.

Here, Henderson did not file a motion to replace his standby counsel. And, even if he had filed a motion, the trial court had discretion to grant or deny this motion. See id. (noting that once a defendant elects to represent himself, the trial court has no obligation to reappoint counsel). The court is not required to inquire into a breakdown of communication before a formal motion is made. And, the authority Henderson relies on does not require an inquiry before denying such a motion when properly made.[5] Therefore, we hold that the trial court did not err in failing to do so here.

---

[5] Henderson contends that State v. McDonald, 143 Wn.2d 506, 22 P.3d 791 (2001) requires the trial court to inquire into a breakdown of communication between a pro se defendant and standby counsel. But, McDonald does not support this contention. McDonald recognized that the trial court has a duty to inquire into a possible conflict of interest between defendant and standby counsel. Id. at 513. This rule does not apply to a breakdown in communication, and we decline to extend it.

II. Felony Harassment of Officer Boyd

Henderson asserts that the State presented insufficient evidence to convict him of felony harassment of Officer Boyd. He contends that the State proved only that Henderson threatened future, unnamed officers who might come to his door.

In reviewing a challenge to the sufficiency of the evidence, this court asks whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. State v. Brown, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). We view the evidence in the light most favorable to the State, drawing all inferences most strongly against the defendant. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

RCW 9A.46.020 makes it a felony for a person to knowingly threaten to cause bodily injury to a criminal justice participant performing his official duties. According to the jury instructions, for the State to convict Henderson of felony harassment of Officer Boyd, it had to prove the following elements beyond a reasonable doubt:

(1) That on or about [the] 8th day of March, 2014, while in a patrol car, the defendant knowingly threatened to cause bodily injury to Joshua Boyd immediately or in the future;

(2) That the words or conduct of the defendant placed Joshua Boyd in reasonable fear that the threat would be carried out;

(3) That the person threatened was a criminal justice participant while performing his official duties, and the fear from the threat was a fear that a reasonable criminal justice participant would have under all the circumstances;

(4) That the defendant acted without lawful authority; and

9

(5) That the threat was made or received in the State of Washington.

Henderson contends that the State failed to prove that he threatened Officer Boyd. Henderson does not challenge the other elements of this offense.

At trial, Officer Boyd testified[6] that on March 8, 2014, Henderson was placed in Officer Boyd's unmarked car to be transported to jail. On their way, Henderson began explaining loudly that he was an important and prolific drug dealer—he sold $1,000 worth of heroin a day. Henderson continued, telling Officer Boyd that he was going to bail out as soon as he got to jail. And, Henderson said that he had answered the door to the apartment holding a fully loaded "Sig .40"[7] and he should have blasted the officers with it. Officer Boyd testified that Henderson said "he was going to do that the next time that the police officers came to his door." Officer Boyd clarified, he was going to "[b]last us." Henderson was very agitated, repeating his statements multiple times, and referring to Officer Boyd as a bitch.

On a sufficiency of the evidence challenge, we view the evidence in the light most favorable to the State. Salinas, 119 Wn.2d at 201. Officer Boyd testified that Henderson said he would "[b]last us" the next time "the police officers came to his door." (Emphasis added.) A rational trier of fact could understand this as a threat to a specific group of police officers—the ones who just arrested him—not to police officers in general. Officer Boyd was a member of that group. Therefore, Henderson's threat to blast a group of officers that included Officer Boyd was sufficient to prove that Henderson threatened Officer Boyd.

---

[6] While testifying, Officer Boyd refreshed his memory from his police report. That report is not part of the record on appeal.

[7] Officer Boyd understood this to mean a Sig Sauer .40 caliber handgun.

We affirm.

## III. Firearm Sentencing Enhancement

Henderson also contends there was insufficient evidence to prove that he was armed with a firearm when he committed the drug possession offenses. He asserts that the State failed to show the requisite nexus connecting Henderson, the gun, and the drugs.

A person is armed for the purposes of a sentencing enhancement if the weapon is easily accessible and readily available for offensive or defensive use during the time of the crime. Brown, 162 Wn.2d at 431; State v. O'Neal, 159 Wn.2d 500, 504-05, 150 P.3d 1121 (2007). There must also be a nexus between the defendant, the crime, and the weapon. Brown, 162 Wn.2d at 431. The presence of a deadly weapon at the scene, its proximity to the defendant, or constructive possession alone is insufficient to show the defendant was armed. Id.

Henderson asserts that the State's evidence of constructive possession was insufficient to prove the requisite nexus. He cites State v. Gurske, 155 Wn.2d 134, 118 P.3d 333 (2005) for this assertion. There, an officer pulled Gurske over at a traffic stop and determined that he was driving with a suspended license. Id. at 136. The officer arrested Gurske. Id. During an inventory search of Gurske's car, an officer discovered a backpack in the backseat, which contained a pistol and three grams of methamphetamine. Id. The trial court imposed a firearm sentencing enhancement on the unlawful possession charge. Id. at 136-37. But, the Washington Supreme Court reversed, because there was insufficient evidence to show that Gurske was armed. Id. at 143-44. The facts did not show that Gurske

could reach the pistol from where he was sitting, that he had made any movement to do so, or that he had previously used or had access to the weapon. Id. at 143.

But, Henderson overlooks a more recent case, State v. Eckenrode, 159 Wn.2d 488, 150 P.3d 1116 (2007). The police arrived at Eckenrode's house after he called 911 and said that he was armed and ready to shoot an intruder in his house. Id. at 491. While Eckenrode was in his front yard, the police searched his home and found several weapons, drugs, and evidence of drug manufacturing. Id. at 491-92. Eckenrode was convicted of possessing and manufacturing controlled substances. Id. at 492. In upholding the sentencing enhancement, the Eckenrode court distinguished Gurske. Id. at 494-95, 496. The court noted that in Gurske, the State proved only the fact of possession—it did not attempt to show that the weapon was accessible at a relevant time or connected to the crime. Id. at 494-95. By contrast, the court reasoned Eckenrode's earlier statement to the 911 operator was sufficient to show that he was armed, even though Eckenrode was far away from the weapons when he was arrested. Id. at 494. And, the court concluded that a jury could infer from the circumstantial evidence that there was a connection between Eckenrode, the weapons, and the possession and manufacturing of controlled substances. Id. at 495. The weapons were loaded, Eckenrode had a police scanner to evade arrest, and evidence of the illicit business pervaded the house. Id. at 494.

This case is more analogous to Eckenrode than to Gurske. The State identified March 8-12, 2014 as the relevant time period during which Henderson committed the drug possession offenses. During that time period, Henderson, like

12

Eckenrode, said that he was armed and ready to shoot. He told Officer Boyd on March 8 that he came to the door with his fully loaded "Sig .40," and he was prepared to use it. When the officers executed the search warrant on March 12, they discovered Henderson's Sig Sauer .40 caliber handgun in the master bedroom.

The circumstantial evidence here could lead a jury to infer that the gun was present in the bedroom to protect Henderson's illicit business. On March 8, Henderson boasted to the officers that he was a big drug dealer who sold $1,000 of heroin each day, and he had just thrown away three grams of heroin while running from them. He also told Officer Boyd about possessing his "Sig .40" when the officers came to the door that day. When the officers returned to execute the search warrant on March 12, they watched Henderson leave the apartment. When the officers entered the apartment, they found Henderson's employee ID badge, mail, and receipts scattered throughout the master bedroom. They found the Sig Sauer .40 caliber handgun under the mattress. And, the officers found pills in a men's jacket hanging in the closet. When the officers arrested Henderson that evening, Henderson said, " 'You guys didn't get my black or any of my stacks. I should have took my gun with the black.' "[8]

Viewing this evidence in the light most favorable to the State, the weapon was easily accessible and readily available for offensive or defensive use during the time of the crime. Henderson stated he was willing to use the firearm to protect

_____

[8] Officer Wimbles testified as to this statement. He understood "black" and "stacks" to be street terms for heroin and money.

13

his business as a drug dealer. We hold that the sentencing enhancement was supported by sufficient evidence.

IV. Prosecutorial Misconduct

Henderson argues that prosecutorial misconduct deprived him of a fair trial. He challenges three parts of the prosecutor's closing argument.

Prosecutorial misconduct can deprive a defendant of the constitutional right to a fair trial. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). To succeed on a prosecutorial misconduct claim, a defendant must show that the prosecutor's conduct was both improper and prejudicial, considering the context of the record and all circumstances at trial. Id. at 704. Prejudice is established if there is a substantial likelihood that misconduct affected the verdict. State v. Boehning, 127 Wn. App. 511, 518, 111 P.3d 899 (2005). We review the prosecutor's statements during closing in light of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. Id. at 519. The defendant waives this argument by failing to object to the remark at trial, unless the remark is so flagrant and ill-intentioned that it could not have been mitigated by a curative instruction. State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997).

A.    Constructive Possession Analysis

Henderson contends that the prosecutor committed misconduct by misstating the law on constructive possession.

During closing argument, the prosecutor distinguished between actual and constructive possession. He explained that constructive possession is when the

object is in the person's dominion and control. He applied this definition to Henderson's possession of the gun and drugs by explaining,

> The defendant had actual possession of the gun that he went to the door [with] when the police arrived there. He had constructive possession of it when he didn't have the gun and had control over those premises. . . . *The defendant had been in that apartment on March 12th, in that structure where the gun was, where the drugs were. He was in constructive possession on that day as well.*

The prosecutor continued, "He was in constructive possession of [the drugs]. They were in his room. The defendant resided there. He had mail there. He had documents there. He had his ID badge there. His gun was there, all in that room that he had dominion and control over." The prosecutor also pointed to Henderson's statement that he deals heroin as evidence that Henderson possessed the drugs in the apartment.

In arguing that the prosecutor misstated the law, Henderson focuses solely on the italicized statement above. Henderson asserts that this statement informed the jury that dominion and control over the premises, rather than the objects, was sufficient to establish constructive possession.

If Henderson's interpretation of the prosecutor's statements was correct, the prosecutor would have misstated the law. Constructive possession is established by dominion and control over the object. See State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014). Dominion and control over the premises in which the object is found is one factor in establishing constructive possession. State v. Tadeo-Mares, 86 Wn. App. 813, 816, 939 P.2d 220 (1997). But, constructive possession is determined by the totality of the circumstances. Id. at 817.

Here, the prosecutor argued that the totality of the circumstances showed that Henderson had constructive possession over the gun and drugs. The prosecutor pointed to the evidence that the officers found when they searched the bedroom of the apartment Henderson had just left. The officers found Henderson's ID badge on the dresser, his mail and receipts in the room, the gun under the mattress, and the drugs in the pocket of a jacket in the closet. And, the prosecutor reminded the jury of Henderson's statements connecting him to the gun and the drugs. The statement Henderson challenges was only one factor of this analysis. Considering the context in which this statement was made, we conclude that the prosecutor did not mischaracterize the law, but instead properly applied it. Therefore, we hold that this statement was not improper.

Moreover, even if this statement were improper, it was not prejudicial. The jury instructions defined constructive possession as dominion and control over an item. They specified that "[p]roximity alone without proof of dominion and control is insufficient to establish constructive possession." And, the jury was told to consider all relevant circumstances in deciding if Henderson had dominion and control over an item. We presume that juries follow jury instructions. State v. Hopson, 113 Wn.2d 273, 287, 778 P.2d 1014 (1989). We hold that Henderson has not shown that the prosecutor's statements about constructive possession were improper or prejudicial.[9]

_____

[9] Henderson also argues, in a statement of additional grounds, that the State failed to prove he had constructive possession of the drugs and the gun. But, based on the facts discussed above, we conclude that there was sufficient evidence to show that Henderson was in constructive possession of the drugs and the gun.

B.    Burden Shifting Regarding Witnesses

Henderson also argues that the prosecutor committed misconduct by shifting the burden of proof during closing argument.

During Henderson's closing argument, he pointed to several witnesses who could have strengthened the State's case, but who were not called to testify. The prosecutor responded to this argument in his rebuttal, "Well, you could ask the same question of the defendant. Why didn't he call the other officers if they had something different to say?" Henderson objected to this as burden shifting, and the court sustained the objection. Immediately afterward, the prosecutor continued, "The defendant tells you, where is Tera Hill, the defendant's own girlfriend? Where is Tera Hill? Certainly someone that could have been called, but she has nothing to say --." Henderson again objected, and the court sustained the objection.

It is improper for the State to argue that the burden of proof rests with the defendant. State v. Thorgerson, 172 Wn.2d 438, 453, 258 P.3d 43 (2011). The State may not suggest that the defendant was obligated to call witnesses or present evidence proving his innocence. State v. Cleveland, 58 Wn. App. 634, 647, 794 P.2d 546 (1990). Yet, this is exactly what the prosecutor did in asking why Henderson did not call particular witnesses. The trial court was correct to sustain Henderson's objections. The State concedes that these statements were improper, but the State argues that Henderson has failed to establish prejudice.

Prosecutorial misconduct requires reversal, unless the error was harmless beyond a reasonable doubt. State v. Staten, 60 Wn. App. 163, 174, 802 P.2d 1384

17

(1991). The State compares this case to Cleveland, where a similar argument was found to be harmless error. 58 Wn. App. at 648-49. There, the prosecutor argued in rebuttal closing argument, " 'Mr. Cleveland was given a chance to present any and all evidence that he felt would help you decide. He has a good defense attorney, and you can bet your bottom dollar that Mr. Jones would not have overlooked any opportunity to present admissible, helpful evidence to you.' " Id. at 647. The Court of Appeals concluded that this statement was improper, because it implied that Cleveland had a duty to present favorable evidence. Id. at 648. But, it noted that the jury instructions correctly provided that the State had the burden of proof on every element and the jury could find a reasonable doubt even without defense evidence. Id. And, the court noted that the prosecutor's improper argument would not have influenced the jury given the facts of the case. Id. Cleveland was charged with child molestation, so the State's case depended on whether the jury believed the victim. Id. Any affirmative evidence Cleveland might have produced would not have affected the victim's credibility. Id. 648-49. Therefore, the improper argument was harmless error beyond a reasonable doubt. Id. at 649.

Here, the objection was sustained. Yet, the prosecutor immediately attempted to shift the burden onto Henderson again. That objection was also sustained. Henderson did not ask the trial court to strike the comments from the record or to instruct the jury to disregard them. Nonetheless, the jury instructions did properly inform the jury of the burden of proof. Juries are presumed to follow jury instructions. Hopson, 113 Wn.2d at 287.

The references to calling witnesses did not suggest what, if any, evidence those witnesses would have provided. And, the evidence against Henderson was strong. The officers learned of Henderson's association with the apartment through Henderson's previous contact with the police. Henderson answered the door of the apartment on March 8, when the officers arrested him. He returned to the apartment after posting bail—the officers observed him exiting the apartment on March 12. Henderson told the police that he owned a Sig Sauer .40 caliber handgun, and when the officers found it in the apartment, he confirmed that it was his. And, he confirmed that he lived at the apartment. He also told the police that he was a successful drug dealer, and he bragged several times that he had hidden his "black" before the police could find it. Therefore, we hold that while the prosecutor's argument was improper, it was harmless beyond a reasonable doubt.

C.    "Heart of Hearts" Idiom

Henderson also argues that the prosecutor committed misconduct by minimizing the State's burden of proof.

During the prosecutor's rebuttal closing argument, he defined a reasonable doubt as " 'such a doubt as would exist in the mind of a reasonable person after fully, fairly[,] and carefully considering all of the evidence or lack of evidence.' " He explained, "If from such a consideration you have an abiding belief in the truth of the charges, then you are convinced beyond a reasonable doubt." The prosecutor then said, "If you believe in your heart of hearts that, yes, these elements have been proven --." Henderson did not object to this phrasing at trial.

Henderson construes the "heart of hearts" idiom to mean that the jurors could rely on a gut feeling that Henderson seemed guilty, rather than having to find him guilty beyond a reasonable doubt. He asserts that this idiom would allow the jury to rely on his general demeanor or his reputation as a drug dealer, instead of the merits of the case.

Henderson's interpretation takes the phrase out of context. The prosecutor told the jury to look into their heart of hearts to determine, based on the evidence presented, that all of the elements had been satisfied. The prosecutor continued by pointing out all of Henderson's arguments that distracted the jury from the evidence presented. And, the prosecutor began his rebuttal argument by emphasizing the burden of proof in this case. In this context, the "heart of hearts" idiom served to clarify the burden of proof, much like the phrase "abiding belief." See State v. Kinzle, 181 Wn. App. 774, 784, 326 P.3d 870 (2014) ("The phrase 'abiding belief in the truth of the charge' merely elaborates on what it means to be 'satisfied beyond a reasonable doubt.'"), review denied, 181 Wn.2d 1019, 337 P.3d 325 (2014). This is not an improper statement. We hold that the prosecutor did not commit misconduct in using this idiom.

Additionally, even if this statement did constitute misconduct, it was not prejudicial. Henderson did not object to this statement, so for it to be prejudicial, it must have been so flagrant and ill-intentioned that an instruction could not have cured it. Boehning, 127 Wn. App. at 518. An improper argument may be flagrant and ill-intentioned if this court had already recognized it as improper in a published opinion. State v. Fleming, 83 Wn. App. 209, 214, 921 P.2d 1076 (1996). But, we

20

have not recognized "heart of hearts" as an improper idiom to explain reasonable doubt. Additionally, the prosecutor emphasized that the burden of proof rests with the State, and that it is a heavy burden. The jury received jury instructions reiterating that burden and the jury's responsibility to reach a decision based on the law and the facts, not personal preference. These steps mitigated any potential prejudicial effect of the "heart of hearts" idiom. Any error resulting from the "heart of hearts" phrase was harmless beyond a reasonable doubt.

## V. Constitutionality of RCW 69.50.4013

Henderson contends that RCW 69.50.4013 violates both the Eighth Amendment and the Fourteenth Amendment's guarantee of due process, because it imposes felony sanctions on possession of drug residue without a culpable mental state.

RCW 69.50.4013 makes it unlawful to possess a controlled substance without a valid prescription or as otherwise authorized. This statute contains no mens rea requirement. State v. Bradshaw, 152 W.2d 528, 539, 98 P.3d 1190 (2004).

This court reviews constitutional challenges de novo. In re Welfare of A.W., 182 Wn.2d 689, 701, 344 P.3d 1186 (2015). We presume statutes to be constitutional, and the challenger must convince us beyond a reasonable doubt that the statute violates the constitution. Id.

The Eighth Amendment provides that "[e]xcessive bail shall not be required . . . nor cruel and unusual punishments inflicted." When an extreme punishment is

21

grossly disproportionate to the crime, it will be deemed cruel and unusual.[10] Graham v. Florida, 560 U.S. 48, 59-60, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

Division Two of this court recently addressed an identical challenge to RCW 69.50.4013 in State v. Schmeling, No. 46218-4-II, 2015 WL 8925818, at *1 (Wash. Ct. App. Dec. 15, 2015). It rejected Schmeling's Eighth Amendment challenge. Id. at *3. The court held that neither type of Eighth Amendment analysis supported the defendant's argument. Id. at *1. Under the first analysis, the question is whether a sentence is disproportionate to the crime. Id. But, the Washington Supreme Court has already held that classification of a crime as a felony alone does not result in a grossly disproportionate sentence. State v. Smith, 93 Wn.2d 329, 345, 610 P.2d 869 (1980). And, the categorical analysis has only been applied to death penalty cases and life imprisonment without parole for juvenile offenders. Graham, 560 U.S. at 60, 61-62, 82. The Schmeling court declined to extend the categorical analysis to adult drug offenders. 2015 WL 8925818, at *2.

The Schmeling court also rejected the due process challenge to RCW 69.50.4013. Id. at *4. It reasoned that our Supreme Court has twice considered whether the possession of a controlled substance statute contains a mens rea element. Id. at *3. Both times the court concluded that the legislature intentionally omitted a mens rea element. State v. Cleppe, 96 Wn.2d 373, 379-80, 635 P.2d

---

[10] There are two methods of challenging a punishment as grossly disproportionate: an as-applied challenge, which challenges the length of a sentence given all the particular circumstances in a case, and a categorical challenge, which challenges an entire class of sentences. United States v. Shill, 740 F.3d 1347, 1355 (9th Cir. 2014), cert. denied, 135 S. Ct. 147, 190 L. Ed. 2d 108 (2014).

435 (1981); Bradshaw, 152 Wn.2d at 534-37. The court thus held that RCW 69.50.4013 does not violate due process, even though it does not contain a mens rea element. Schmeling, 2015 WL 8925818, at *4.

We find the reasoning in Schmeling persuasive. Henderson has not cited any additional authority to compel a different result. Therefore, we hold that RCW 69.50.4013 violates neither the Eighth Amendment nor due process.

## VI. Legal Financial Obligations

Henderson argues for the first time on appeal that the trial court erred by ordering him to pay $1,400 in legal financial obligations (LFOs) without conducting an individualized inquiry into his ability to pay. He assigns error to finding of fact 2.5, which found that Henderson had the ability to pay the LFOs.

Here, the State recommended a $500 crime victim penalty assessment, a $200 criminal filing fee, a $1,000 fine, a $1,500 DAC recoupment, a $100 DNA (deoxyribonucleic acid) fee, and a $100 crime laboratory analysis fee. Henderson's standby counsel asked the court to waive the DAC recoupment, because Henderson received minimal assistance from standby counsel, and the $1,000 fine, because Henderson is indigent. The court decided, that it would waive the $1,000 drug fine and reduce the DAC recoupment to $500. Otherwise, the court imposed the LFOs requested by the State. Henderson's judgment and sentence reflected this decision and included finding of fact 2.5:

> ABILITY TO PAY LEGAL FINANCIAL OBLIGATIONS. The court has considered the total amount owing, the defendant's past, present[,] and future ability to pay legal financial obligations, including the defendant's financial resources and the likelihood that the defendant's status will change. The court finds that the

23

defendant has the ability or likely future ability to pay the legal financial obligations imposed herein. RCW 9.94A.753.

Henderson relies on State v. Blazina, 182 Wn.2d 827, 344 P.3d 680 (2015) to contend that the trial court erred by failing to conduct an individualized inquiry into his ability to pay, as required under RCW 10.01.160(3). In Blazina, the court ordered discretionary LFOs[11] without examining the appellant's ability to pay. 182 Wn.2d at 831. The Blazina court held that RCW 10.01.160(3) requires the trial court to do more than include boilerplate language in the judgment and sentence about ability to pay. Id. at 838. Instead, the trial court must conduct an individualized inquiry into the defendant's current and future ability to pay, looking at factors such as incarceration and other debts. Id.

We may refuse to review issues that were not raised in the trial court. RAP 2.5(a). The Blazina court recognized that each court must make an independent decision whether to address LFOs challenged for the first time on appeal. 182 Wn.2d at 834-35. We decline to address Henderson's challenge to the LFOs imposed by the trial court.

## VII. Search Warrant of the Apartment

In a statement of additional grounds, Henderson challenges the constitutionality of the search warrant. He claims there was not probable cause to support the warrant.

---

[11] The trial court usually may not consider a defendant's ability to pay when imposing mandatory LFOs. State v. Lundy, 176 Wn. App. 96, 102, 308 P.3d 755 (2013). There are limited circumstances in which mandatory LFOs may be waived. See, e.g., RCW 69.50.430. Mandatory LFOs include filing fees, crime victim penalty assessment fees, and crime laboratory analysis fees. RCW 36.18.020; RCW 7.68.035; RCW 43.43.690.

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Probable cause exists if an affidavit supporting the search warrant contains sufficient facts for a reasonable person to conclude there is a probability of criminal activity. State v. Vickers, 148 Wn.2d 91, 108, 59 P.3d 58 (2002).

To review a search warrant for probable cause, we examine the facts available to the issuing judge. See State v. Seagull, 95 Wn.2d 898, 907, 632 P.2d 44 (1981). But, the record on appeal in this case does not contain the affidavit in support of the search warrant. We may decline to address a claimed error when there is a material omission in the record. State v. Wade, 138 Wn.2d 460, 465, 979 P.2d 850 (1999). Accordingly, we do not consider Henderson's probable cause argument.

Henderson also contends that, as applied to the search of his person, the warrant fails the particularity requirement. A search warrant must be sufficiently definite such that an officer can identify with reasonable certainty the items sought. State v. Stenson, 132 Wn.2d 668, 691-92, 940 P.2d 1239 (1997). The search warrant in this case authorized the officers to search the apartment and any persons within or associated with said property. Officer Boyd obtained the search warrant after Henderson was arrested on an outstanding warrant. Henderson was not within the apartment when the warrant was executed, and no evidence was obtained from the person of any individual at the apartment. Moreover, even if Henderson is correct that the warrant lacked particularity, that portion could be

severed. State v. Carter, 79 Wn. App. 154, 161-62, 901 P.2d 335 (1995) ("Where a search warrant separately and distinctly describes two targets, here a person and a place, and part of it is later determined to be defective, the court may treat the warrant as severable and uphold it as to the remaining valid target."). Once the officers searched the apartment, they had independent probable cause to arrest and search Henderson. Therefore, we conclude that the search warrant was constitutional.

VIII. Evidentiary Hearing

Henderson argues in his statement of additional grounds that the trial court erred by failing to hold an evidentiary hearing after Henderson filed a motion requesting one.

Henderson argues that the search warrant was forged, and he was entitled to an evidentiary hearing in which the State would have to show facts supporting the validity of the warrant. But, for an evidentiary hearing to be necessary, Henderson would have needed to allege deliberate falsehood or reckless disregard for the truth. Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). And, he would have needed to support those allegations by an offer of proof. Id. Henderson's motions for an evidentiary hearing and a return of property consisted of bare allegations of misconduct, unsupported by an offer of proof. Therefore, the trial court did not err in failing to grant an evidentiary hearing.

## IX. Governmental Misconduct

Henderson alleges in his statement of additional grounds that the Tacoma police officers and the prosecutor committed egregious governmental misconduct. He asserts that the police officers forged the search warrant, and the prosecutor knew about it.

There is no evidence in the record to suggest that the search warrant was forged. Officer Boyd testified that he applied for a search warrant after arresting Henderson on March 8, when Henderson proclaimed that he was a successful drug dealer and he owned a Sig Sauer .40 caliber handgun. And, Henderson has provided a copy of the search warrant that was signed by a judge. If there are material facts other than those that have been previously presented, Henderson's recourse is to bring a personal restraint petition. RAP 16.4 (providing that a petitioner may bring a personal restrain petition if material facts exist which have not previously been presented and heard).

We affirm.

WE CONCUR: