[No. 11877–7–II.   Division Two.   August 14, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. BRIAN SCOTT MEDCALF, *Appellant.*

*Steven B. Dixon* and *Crawford, McGilliard, Peterson & Yelish,* for appellant (appointed counsel for appeal).

*C. Danny Clem, Prosecuting Attorney,* and *Irene K. Asai, Deputy,* for respondent.

REED, J.—Brian Medcalf appeals his second degree statutory rape conviction. He contends that the trial court erred in refusing to suppress evidence seized under a defective warrant, and in permitting testimony regarding his possession of X–rated videotapes. We affirm.

Medcalf first came to the attention of the authorities as one of the participants in a knife fight at a Bremerton apartment complex. Police officers who responded to the emergency learned that the fight had been prompted by the claims of 11–year–old Gigi that Medcalf had sexually assaulted her and that the other combatant was the fiance of Gigi's mother, Julia. On the basis of this information, the officers made a telephonic request for a search warrant. The affiant was David Boynton, one of the officers at the scene. He told the judge:

MR. BOYNTON: Okay. We had at about 2030 hours on 9–18 of '87 a eleven–year–old female by the name of Gigi, that is G–I G–I . . ., date of birth of 4–14–76 was asked by a white male by the name of Brian S. Medcalf, M–e–d–c–a–l–f, of 704 Chester, Apartment 316, which is in the city limits of Bremerton, Washington, Kitsap County, to come to his apartment for two dollars to help clean inside the apartment, which again is Apartment 316. Once GiGi was inside, Mr. Medcalf told her that he didn't want her to clean, but he wanted her to come over and sit on his lap. . . .

MR. BOYNTON: . . . He gave her ten dollars at that particular point in time and started to unbutton her blouse and feel her breast area. He then laid her down on the floor. She repeatedly said, "No, no, I don't want to do this." He then pulled down her pants, and with an erect penis went to force it into her vagina area. He made slight penetration, and then climaxed with semen in the vagina area and on the floor. He then proceeded to wipe it up with a pair of white men's underwear, and

also used a maroon towel. She then left the area, went upstairs, told her mother by the name of Julia . . ., who then advised her fiance, who went downstairs, confronted Mr. Medcalf. A verbal or physical dispute erupted in the hallway where Mr. Medcalf allegedly pulled a knife. Threats were exchanged, a few physical punches. Mr. Medcalf then retreated to his apartment and the Bremerton Police Department showed up, contacted Mr. Medcalf outside of his apartment. Mr. Medcalf was placed under arrest.

The warrant was issued, and the search turned up a knife, a pair of white undershorts, and a reddish–brown towel. The towel and the undershorts, as well as Gigi's underpants, all bore stains that were found to contain spermatozoa. Tests of the stains on the undershorts and the towel indicated that the secretor's blood type was O, the same as Medcalf's. The concentration of seminal fluid in Gigi's underpants was insufficient to permit determination of the secretor's blood type. At trial, Gigi identified the towel and the undershorts as those she had seen in Medcalf's apartment and testified to the circumstances of the crime, providing generally the same information excerpted above from the affidavit.

Medcalf sought unsuccessfully to suppress the evidence seized from his apartment. He contended below, as he does here, that the affidavit supporting the search warrant did not adequately establish the informant's reliability because it failed to specifically identify that individual. The trial court found that the information supplied was sufficient to justify the conclusion that the informant was either the victim, her mother, or her mother's fiancee, and established probable cause to search. We agree.

▮ When an affidavit in support of a search warrant contains hearsay information, the constitutional criteria for determining probable cause is measured by the 2–prong *Aguilar–Spinelli* test. *State v. Lair,* 95 Wn.2d 706, 709, 630 P.2d 427 (1981). To satisfy that test, the person requesting the warrant must show that (1) the information is reliable, and (2) the informant's basis of information is credible. *Aguilar v. Texas,* 378 U.S. 108, 114, 12 L. Ed. 2d 723, 84 S.

Ct. 1509 (1964); *Spinelli v. United States,* 393 U.S. 410, 413, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969); *State v. Smith,* 110 Wn.2d 658, 662, 756 P.2d 722 (1988), *cert. denied,* 488 U.S. 1042, 102 L. Ed. 2d 991, 109 S. Ct. 867 (1989). In making this determination, the court is to resolve doubts in favor of the warrant. *State v. Helmka,* 86 Wn.2d 91, 93, 542 P.2d 115 (1975). It should interpret the affidavit in a commonsense and realistic fashion, recognizing that affidavits for search warrants are normally drafted by nonlawyers in the midst and haste of a criminal investigation. *See United States v. Ventresca,* 380 U.S. 102, 108, 13 L. Ed. 2d 684, 689, 85 S. Ct. 741 (1965). The magistrate is entitled to draw reasonable inferences from the facts and circumstances set forth. *State v. Smith,* 110 Wn.2d at 663. Such inferences can relate to the identity of the informant. *See United States v. Melvin,* 596 F.2d 492, 497 (1st Cir. 1979) (it was reasonable to infer that the "unknown male" to which the affidavit referred was a bystander witness), *cert. denied,* 444 U.S. 837 (1980); *State v. Matlock,* 27 Wn. App. 152, 155, 616 P.2d 684 (1980) (reasonable to assume that "officer" providing information was a police officer, rather than an officer in a corporation or an officer in the military).

Here, the numerous explicit details about the crime that were provided in the affidavit strongly suggest that the informant, or one of the informants, was the victim herself, or her mother who had heard her immediate account of the incident.[1] It is highly unlikely that anyone else would have known all of those facts. *See State v. Hett,* 31 Wn. App. 849, 852, 644 P.2d 1187, *review denied,* 97 Wn.2d 1027 (1982), holding that informant's detailed description of sale and storage of marijuana indicated that he was not relying

---

[1]Assuming that the informant was Gigi's mother, her report of Gigi's statements would provide sufficient basis for the warrant. Even if the statements are not encompassed by the "excited utterance" exception, probable cause for the issuance of a search warrant may be based on hearsay received from an informant when a reasonable person would conclude that both the information given and the informant are reliable. *State v. Jackson,* 102 Wn.2d 432, 437–38, 688 P.2d 136 (1984); *State v. Burleson,* 18 Wn. App. 233, 238, 566 P.2d 1277 (1977).

on casual rumor, but had personally observed the matters about which he provided information.

■ Officer Boynton's affidavit provided the identities and address of Gigi and her mother. Identified citizen informants such as they are entitled to a presumption of reliability because the danger of casual rumor, irresponsible conjecture, or general troublemaking is substantially minimized in such cases, and the report is less likely to be colored by self–interest. *State v. Wakeley*, 29 Wn. App. 238, 241, 628 P.2d 835, *review denied*, 95 Wn.2d 1032 (1981); *see State v. Northness*, 20 Wn. App. 551, 557, 582 P.2d 546 (1978).

The presumption is particularly appropriate here. This is not the suspect type of situation envisioned by the framers of the suppression rule. In such cases the "confidential informer" himself usually has connections with the underworld. Quite often he has a personal stake in the outcome of the official action he seeks to inspire by informing.

■ By contrast, the information related by Officer Boynton surfaced only as a result of his having responded to a report of a violent physical altercation. The "aggrieved parties" had apparently elected to take the law into their own hands, rather than simply inform on the defendant. Additionally, the wealth of intimate detail regarding the sexual assault tends to lend credence and believability to the story offered by the relator(s).[2]

Medcalf next contends that the testimony about his X–rated videotapes should have been excluded. We agree.

Officer Steve Emm testified that he observed in Medcalf's apartment a number of videocassettes on which

---

[2]In *State v. Northness*, 20 Wn. App. at 557, we held that intrinsic indicia of the informant's reliability may be found in his detailed description of the underlying circumstances of the crime. It noted that where the detailed information encompassed in the affidavit's "internal context" attests to the informant's reliability by its very specificity, no independent corroboration is required.

children's film titles were followed by X–rated movie titles. The State argued that the evidence was relevant because the movies were "a rather unique device to, one, entice children, and then two, apparently to show them exactly how to do it." However, Gigi testified that she had never been invited to Medcalf's apartment to watch movies, and there was no evidence that she had watched any while she was there.

ER 404(b) prohibits the use of evidence of other crimes, wrongs, or acts to prove the character of a person in order to show that he acted in conformity therewith. While this kind of evidence may be admissible to establish motive, intent, preparation, or plan, evidence showing lustful disposition should be admitted in a sex offense case only when it tends to show such lustful inclination toward the offended female. *State v. Ferguson,* 100 Wn.2d 131, 134, 667 P.2d 68 (1983); *State v. Bernson,* 40 Wn. App. 729, 737–38, 700 P.2d 758, *review denied,* 104 Wn.2d 1016 (1985). The evidence in this case does not. These videotapes have no connection with Gigi. The admission of Officer Emm's testimony about them was, therefore, improper.

However, because of the weight of the evidence against Medcalf, we are persuaded that this error does not require reversal. Error in admitting evidence is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected. *State v. Robtoy,* 98 Wn.2d 30, 44, 653 P.2d 284 (1982).

Gigi testified with a great deal of certainty and in significant detail about what had happened. Her claims were corroborated by the presence of semen stains on the men's undershorts and the towel which she had described and on her own underpants. There was no evidence suggesting that she had a motive to lie and no innocent explanation for her

knowledge that the undershorts and towel had been used to clean up seminal fluid. The only rebuttal of all of this evidence was Medcalf's own implausible version of events. Under these circumstances, there is no reasonable possibility that the verdict would have been different had the jury not known about the videotapes.

The judgment is affirmed.

ALEXANDER, C.J., and WORSWICK, J., concur.