[No. 31469-0-II.   Division Two.   May 17, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. RANDY ALLEN BOEHNING, *Appellant*.

---

[2] *State ex rel. Citizens Against Tolls (CAT) v. Murphy*, 151 Wn.2d 226, 242-43, 88 P.3d 375 (2004).

[3] *CAT*, 151 Wn.2d at 242.

[4] *City of Pasco v. Pub. Employment Relations Comm'n*, 119 Wn.2d 504, 507, 833 P.2d 381 (1992).

512

*Randy Allen Boehning*, pro se.

*David Schultz*, for appellant.

*Arthur D. Curtis, Prosecuting Attorney*, and *Scott D. Jackson, Deputy*, for respondent.

¶1 BRIDGEWATER, J. — Randy Allen Boehning appeals his conviction of three counts of first degree child molestation. We hold that prosecutorial misconduct occurred when the prosecutor referred to three counts of rape that had been dismissed while suggesting that the victim's statements supported those counts but she was not "comfortable" enough to testify about those rapes at trial. 3B Report of Proceedings (RP) (Oct. 21, 2003) at 254. This argument appealed to the passion and prejudice of the jury, was flagrant, and called on the jury to determine guilt on improper grounds.

¶2 The prosecutor also impermissibly bolstered the victim's credibility by arguing that her prior statements, which were (1) plainly hearsay, (2) not admissible (the victim was 10 years old at the time of the hearsay so chapter 9A.44 RCW was not implicated), and (3) not admitted, were consistent with her trial testimony. The prosecutor based this argument on the fact that the defense counsel did not impeach the victim with any prior inconsistent statements to witnesses. The State's claim that this is a reasonable inference is wrong; this argument also constituted prosecutorial misconduct.

¶3 During trial, the prosecutor also asked Boehning whether the victim had "made [it all] up." 3B RP at 219. This placed Boehning in a position where he had to challenge the truthfulness of the child's testimony. This is flagrant prosecutorial misconduct and highly prejudicial in a case where there were no witnesses or physical evidence to corroborate the victim's testimony.

¶4 We reverse and remand for a new trial.

## FACTS

¶5 Randy and Pam Boehning provided foster care in their Vancouver, Washington home. H.R., a female child born February 15, 1992, lived with the Boehnings from October 6, 1997, to March 24, 1998, when she returned to her family's care.

¶6 In the fall of 2000, H.R. was again placed in foster care. H.R. lived with Diana Tomlinson in Damascus, Oregon. During that time, H.R. disclosed to Tomlinson that her previous foster father had made her do "nasty" things. 2 RP (Oct. 20, 2003) at 47. Tomlinson reported H.R.'s statements to her caseworker. No action was taken until February 2003, when H.R. disclosed to her family's social worker, Carey Price, that she had been sexually abused. Price then reported the incident to police in Washington and Oregon.

¶7 On February 27, 2003, Detective Aaron Holladay of the Vancouver Police Department interviewed H.R. Detective Holladay and Sergeant Rod Trumph then contacted the Boehnings at their residence. Boehning was subsequently charged with three counts of first degree rape of a child or, in the alternative, three counts of first degree child molestation.

¶8 A jury trial commenced on October 20, 2003. H.R., then 11 years old, testified that while she lived with the Boehnings, Boehning had pulled her into the bathroom and removed her pants and underwear. Boehning removed his own pants, kissed her with an open mouth, and laid her down on the floor. Boehning then rubbed his "dick" in a circle on her vagina, and he told her not to tell anyone because it was a "naughty thing." 2 RP at 78, 80. H.R. further testified that this had occurred more than twice when Mrs. Boehning was not home.

¶9 During Boehning's cross-examination of H.R., he asked her about the abuse and then questioned, "Did you ever ride in a car besides riding to their [the Boehning's] house?" 2 RP at 95. The State objected, and the court ordered defense counsel to "focus on the relevant events." 2 RP at 96.

¶10 Tomlinson, Price, and Detective Holladay each testified that H.R. had disclosed the abuse to them; Boehning did not object to their testimony. Tomlinson testified that H.R. told her that she was scared and that "[s]omething bad" had happened to her in foster care. 2 RP at 46. H.R then disclosed that, *"when she was in foster care before*[,] *. . . the foster father made her do nasty things."* 2 RP at 47 (emphasis added). The prosecutor then asked Tomlinson whether H.R. had indicated why she was still scared, and Tomlinson replied:

> She—the way I took it is that, you know, she felt like maybe this person could still come after her, still make her do something, or this person would still do to her, you know.

And I did ask her, [h]ave you ever told anybody? [Y]ou know. *And then me being a foster parent, I knew how important it was that she was telling me the truth.*

2 RP at 47 (emphasis added).

¶11 Price testified that while he was counseling H.R. and her family, H.R. disclosed that she had been sexually abused. The prosecutor then asked Price, "So you had some information about disclosure of sexual abuse from [H.R.] . . . [w]hat did you do with that information?" 3A RP (Oct. 21, 2003) at 110-11. Price responded that she had reported the disclosure to the police.

¶12 Detective Holladay testified that he interviewed H.R. after receiving a Child Protective Services' referral. H.R. told him that she did not know her abuser's name but that he had a *"black beard and black short hair."* 3A RP at 141 (emphasis added). Detective Holliday stated that this information was important to his investigation because Boehning had a short, black beard, and it helped him connect Boehning with the person H.R. had described.

¶13 In addition, Detective Holladay opined that, based on his prior training in child sex abuse cases and experience working with sexually abused children, it is common for children to delay reporting sexual abuse because they may be experiencing embarrassment, guilt, and shame. He further stated that children might delay reporting abuse because they do not realize that "something that's happening to them is a wrong event . . . until they get older." 3A RP at 134. Boehning objected to Detective Holladay's testimony on the grounds that Detective Holladay was not qualified to proffer expert testimony about delayed disclosure; the court overruled the objection.

¶14 Boehning testified on his own behalf. He denied sexually abusing H.R., and he presented witnesses who testified that he had no opportunity to be alone with H.R. because of his demanding work schedule. During cross-examination, the prosecutor asked Boehning whether H.R. would have a reason to be "upset" with him, to which he

replied "no." 3B RP (Oct. 21, 2003) at 217. The prosecutor then asked, "So *what you would say is that this is a little girl who has no reason to be mad at you, has come forward and made this up for no reason at all*[?]" 3B RP at 219 (emphasis added). Boehning responded that it was "possible." 3B RP at 219. Boehning did not object to the State's questioning.

¶15 At the close of the evidence, the State dismissed the three first degree rape charges and amended the information to include only the three first degree molestation charges. During closing arguments, the prosecutor stated that H.R. was not able to "talk with this group of strangers *as well as she was able to do it one-on-one in the past*" and that there were "*some other charges, those charges aren't present anymore because she didn't want to talk about this as much as she was willing to talk about it before.*" 3B RP at 245 (emphasis added).

¶16 The prosecutor further argued:

Is open court—you know, just think about this common sense, common experience, is open court going to be the best place to gather information from a child? Or is it going to be in a place where a child might feel a little safer? . . . *And so it's reasonable that this child might have gone a little farther in discussing what happened to her in a safer environment.*

3B RP at 261 (emphasis added).

¶17 Additionally, the prosecutor argued that, because Boehning had failed to establish that H.R.'s statements about the abuse to Tomlinson, Price, and Detective Holladay were inconsistent with her testimony at trial, the jury could infer that each of H.R.'s statements was consistent and that she was a credible witness. The prosecutor also commented:

One thing the State submits that you should give a lot of time thinking about . . . is to think about why does anyone ever fabricate anything. *Because if you don't have an abiding belief in* [H.R.], *that means she made something up.* Well, why would [H.R.] make this up?

3B RP at 240 (emphasis added). Boehning did not object to the prosecutor's closing arguments.

¶18 The jury convicted Boehning of all three counts of first degree child molestation.

## ANALYSIS

### Prosecutorial Misconduct

■ ¶19 We begin our discussion with an obvious truism: Every prosecutor is a quasi-judicial officer of the court, charged with the duty of ensuring that an accused receives a fair trial. *State v. Coles*, 28 Wn. App. 563, 573, 625 P.2d 713, *review denied*, 95 Wn.2d 1024 (1981); *State v. Huson*, 73 Wn.2d 660, 663, 440 P.2d 192 (1968), *cert. denied*, 393 U.S. 1096 (1969). We hold that the prosecutor's misconduct in this case violated that duty, both in the closing argument and in the presentation of evidence.

■ ¶20 In order to establish prosecutorial misconduct, Boehning must show that the prosecutor's conduct was improper and prejudiced his right to a fair trial. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). Prejudice is established where " 'there is a substantial likelihood the instances of misconduct affected the jury's verdict.' " *Dhaliwal*, 150 Wn.2d at 578 (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995), *cert. denied*, 518 U.S. 1026 (1996)).

■ ■ ¶21 Boehning did not object to the prosecutor's questioning and arguments below. A defendant who fails to object to an improper remark waives the right to assert prosecutorial misconduct unless the remark was so "flagrant and ill intentioned" that it causes enduring and resulting prejudice that a curative instruction could not have remedied. *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995). In determining whether the misconduct warrants reversal, we consider its prejudicial nature and its cumulative effect. *State v. Suarez-Bravo*, 72 Wn. App. 359, 367, 864 P.2d 426 (1994).

Here, the remarks concerning evidence, not testified to, of three dismissed rape charges denied Boehning a fair trial. Other remarks also denied Boehning a fair trial, as did calling on Boehning to comment on the victim's credibility.

## A. *Closing Arguments*

¶22 Boehning contends that certain of the prosecutor's closing remarks constituted misconduct. He asserts that the prosecutor impermissibly focused on facts outside the evidence—i.e., H.R.'s out-of-court statements to Tomlinson, Detective Holladay, and Price, and the three uncharged rape counts.

■ ■ ¶23 We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *Dhaliwal*, 150 Wn.2d at 578; *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997), *cert. denied*, 523 U.S. 1007 (1998). A prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury. *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991). However, a prosecutor may not make statements that are unsupported by the evidence and prejudice the defendant. *State v. Jones*, 71 Wn. App. 798, 808, 863 P.2d 85 (1993), *review denied*, 124 Wn.2d 1018 (1994).

■ ¶24 We focus on the prosecutor's remarks about H.R.'s out-of-court statements and the three dismissed rape counts. The prosecutor made the following arguments:

> [H.R.] was not able, the [s]tate submits, to talk with this group of strangers *as well as she was able to do it one-on-one in the past with somebody like Detective Holladay. There were some other charges, those charges aren't present anymore because she didn't want to talk about this as much as she was willing to talk about it before.*
>
> So with a group of strangers, however, she did get the courage to tell you enough words, that he had his dick and he moved it in a circle around her vagina, and there was touching, and it was skin-to-skin.

3B RP at 245 (emphasis added).

> [H.R.] spoke to Diana Tomlinson. [H.R.] spoke to Carey Price. [H.R.] spoke to this detective here. [H.R.] spoke to Defense counsel. And then [H.R.] spoke to you, many months later.
>
> And when [H.R.] was speaking, Defense counsel had the opportunity to cross her on any of her previous statements, any of her previous statements to Carey Price, to Detective Holladay, to Diana Tomlinson, to himself, and he did so, remember? He asked some questions about prior stuff.
>
> *But he never pointed out that she told a different story to these other individuals. The only reasonable inference is she didn't tell a different story to these other individuals, because he would do his job and he would bring it up.*
>
> The State can't bring up hearsay, but he can bring up any inconsistent statements, and *there were no inconsistent statements, and that's why you didn't hear them. So she has been very consistent.*

3B RP at 246-47.

> [T]he State submits that [H.R.] has not been inconsistent. [H.R.] certainly has not been inconsistent about what happened to her. You know, as I indicated earlier, *the only thing you can infer from what's been brought up in terms of what happened to her, what this man did to her, is that when she talked to people one-on-one many months ago,* people who had gained some trust with her, *there's an inference that she must have said something a little bit more, because you heard about some other charges. But when talking to this group of strangers, she wasn't comfortable enough going that far.*
>
> [H.R.]'s statements you could argue or they will argue are inconsistent with other things that we know about, other external information, okay. So *the details of what she tells you, the acts that happened to her, consistent, all right, she's consistent.*

3B RP at 253-54.

> Again, common sense goes back to thinking . . . why would she make this up. She has no reason to make it up. She has no one to get in trouble, she has nothing to get out of

trouble . . . and Diana's talking to her about it and asking her about it, and *then she tells in detail information that happened to her, and she tells this to Diana Tomlinson.*

And then she comes and she talks to you. And *there wasn't anything brought up that she told a different story to Diana Tomlinson. If she had told a different story to Diana Tomlinson about the touching, you would have heard about it, because Defense counsel would bring up something if it was different. So the reasonable inference, when she spoke to Diana Tomlinson, she told her the same thing she told you.*

. . . .

Is open court—you know, just think about this common sense, common experience, is open court going to be the best place to gather information from a child? Or is it going to be in a place where a child might feel a little bit safer? The *State would submit that it's in a place where a child would feel a little safer. And so it's reasonable that this child might have gone a little farther in discussing what happened to her in a safer environment.*

3B RP at 260-61 (emphasis added).

¶25 These remarks were highly prejudicial and constitute flagrant misconduct. First, the prosecutor argued that H.R.'s disclosures to Detective Holladay, Tomlinson, and Price—disclosures that were inadmissible at trial—were "consistent" with H.R.'s testimony at trial. He then went further, arguing essentially that H.R. had (or that the jury could infer that she had) disclosed even more serious allegations. Further still, the prosecutor twice drew attention to the dismissed rape charges and suggested that H.R.'s previous disclosures would have supported them.

¶26 The State contends that the prosecutor was merely raising reasonable inferences from the evidence. It argues that because the jury was aware that Boehning had been charged with three counts of rape and that these charges were dropped at the close of the evidence, the jury could then reasonably infer that H.R. had initially disclosed information supporting rape charges but was not willing or able to do so at trial. The State further argues that H.R. was

reluctant to testify about the abuse at trial and, consequently, the jury could infer that she was more comfortable disclosing the full extent of the abuse one-on-one with Tomlinson, Detective Holladay, and Price than in discussing it before the jury. These arguments are not well taken.

¶27 That the prosecutor dropped the three rape charges was not "evidence" from which reasonable inferences and arguments about the molestation charges could be made. "[E]vidence" is "[s]omething (including *testimony, documents, and tangible objects*) that tends to prove or disprove the existence of an alleged fact." BLACK'S LAW DICTIONARY 595 (8th ed. 2004) (emphasis added). Moreover, the dismissed rape charges were wholly irrelevant to the State's case, and no reasonable inference regarding the content of H.R.'s out-of-court statements flows from the three dismissed rape counts or her reluctance to describe the abuse at trial. The prosecutor was not raising reasonable inferences and arguments based on the evidence at trial.

¶28 The prosecutor's repeated references to the dismissed rape counts and suggestions that H.R.'s statements supported those charges were uncalled for and impermissibly asked the jury to infer that Boehning was guilty of crimes that had been dismissed and were not supported by trial testimony. *See State v. Torres*, 16 Wn. App. 254, 256, 554 P.2d 1069 (1976). Such argument improperly appealed to the passion and prejudice of the jury and invited the jury to determine guilt based on improper grounds. This error alone compels reversal.

¶29 In arguing that H.R.'s out-of-court statements were consistent with her statements at trial and that she had disclosed *even more* to Tomlinson, Detective Holladay, and Price, the prosecutor left the jury with the impression that these witnesses "had a great deal of knowledge favorable to the State which, but for the court's rulings, would have been revealed." *State v. Alexander*, 64 Wn. App. 147, 155, 822 P.2d 1250 (1992). And the pattern of reiterating these same arguments had the effect of telling the jury what H.R.'s statements were. *See Alexander*, 64 Wn. App. at 155.

This repeated attempt to bolster H.R.'s trial testimony and credibility by instilling inadmissible evidence in the juror's minds was so flagrant as to constitute misconduct.

¶30 Additionally, the prosecutor committed misconduct by repeatedly arguing that, because Boehning had failed to establish that H.R.'s out-of-court statements about the abuse were inconsistent with her testimony at trial, the jury could infer that H.R.'s hearsay statements were consistent with her trial testimony and that she was a credible witness. In so doing, the prosecutor improperly argued that Boehning, not the State, carried the burden of production to present evidence regarding H.R.'s credibility.

¶31 In this case, the jury's verdict turned almost entirely upon the credibility of the complaining witness and the defendant. There were no witnesses or physical evidence to corroborate H.R.'s testimony about the abuse; Tomlinson, Officer Holladay, and Price testified only that H.R. had disclosed the fact of abuse. And the evidence arguably supported either party's version of events. We cannot conclude that a rational jury probably would have returned the same verdict without the prosecutor's improper remarks.

¶32 The prosecutorial misconduct in closing argument denied Boehning a fair trial and warrants reversal.

## B. *Presentation of Evidence*

¶33 Boehning next contends that the prosecutor committed misconduct in asking him on cross-examination whether H.R. had come forward and "made this up for no reason at all." 3B RP at 219; Br. of Appellant at 26. He argues that in doing so, the prosecutor impermissibly asked him to comment on H.R.'s credibility. In response, the State argues that the prosecutor's intent was not to solicit Boehning's opinion regarding whether H.R. was lying but to clarify that she lacked any motive to fabricate the allegations of abuse.

¶34 The prosecutor's cross-examination of Boehning was as follows:

Q: So there would be no reason for [H.R.] to be upset with you because of disciplining, since you never disciplined her, or any other kids.

A: I have no reason why she's mad at me.

Q: That's right, and that's what you told the detective: you can think of no reason for [H.R.] to be making this up; isn't that correct?

A: (Pause.) I didn't do nothin' [sic] wrong, sir.

Q: You're not answering my question. You can think of no reason why [H.R.] would make this up.

MR. SCHILE: It calls for an opinion, Your Honor.

. . . .

THE COURT: It's argumentative. if you could rephrase your question.

BY MR. JACKSON (Continuing)

Q: Did you tell the detective that you could think of no reason for [H.R.] to make this up?

A: I don't remember telling that to the detective.

Q: You don't.

A: No, I don't, sir.

Q: But you just said in open court that you can think of no reason why [H.R.] would be mad at you; isn't that right?

A: That's right.

. . . .

Q: In fact, you laid [sic] down next to her and touched her privates, touched her vagina.

A: I did not do no [sic] such thing, sir.

Q: *So what you would say is that this is a little girl who has no reason to be mad at you, has come forward and made this up for no reason at all.*

A: It's possible.

Q: It's also possible that you did these things, as she indicates.

A: I did no such thing, sir.

3B RP at 217-19 (emphasis added).

¶35 The State's reasoning is not persuasive. Here, the prosecutor went beyond clarifying whether H.R. had a

motive to lie about the abuse, he also clearly asked Boehning whether H.R. "made [it all] up." 3B RP at 219. Asking one witness whether another witness is lying is flagrant misconduct. *See Suarez-Bravo*, 72 Wn. App. at 366.

¶36 In addition, the prosecutor's questioning prejudiced Boehning. H.R.'s credibility was central to the State's case. Placing Boehning in a position where he had to challenge the truthfulness or even the accuracy of an 11-year-old girl's testimony was highly prejudicial. This misconduct is cumulative in compelling reversal.

¶37 Boehning raises other evidentiary issues that we do not address because we reverse and remand for a new trial based upon prosecutorial misconduct. In addition, Boehning, through appellate counsel and pro se, raises claims of ineffective assistance of counsel. We need not address these claims because we reverse on other grounds. But we emphasize that where, as here, the prosecutorial misconduct is so flagrant that it denies the defendant a fair trial, defense counsel should have recognized such an egregious breach.

¶38 In summary, the prosecutor's repeated misconduct during closing arguments, coupled with his improper questioning of Boehning, was so flagrant and prejudicial as to deny Boehning a fair trial. Accordingly, we reverse the judgment and remand for a new trial.

¶39 Reversed and remanded.

QUINN-BRINTNALL, C.J., and MORGAN, J., concur.