IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON, | No. 80365-4-I |
| Respondent, | |
| v. | |
| BARRAGAN, ALFREDO MARTINEZ, DOB: 04/09/1963, | UNPUBLISHED OPINION |
| Appellant. | |

BOWMAN, J. — A jury convicted Alfredo Martinez Barragan of 14 separate

sex offenses involving his biological daughter that occurred over a span of more

than 15 years. Barragan claims the trial court erred by admitting evidence of his

Internet searches related to "father plus daughter" pornography as evidence of

lustful disposition toward his daughter. He also claims the prosecutor's

mischaracterization of the evidence in closing remarks and his counsel's failure

to object to the argument deprived him of a fair trial, and he challenges a

condition of community custody. Because the evidence related to Barragan's

Internet browsing history was directed toward "daughters" or minors in general

but not toward the specific victim in the case, the trial court abused its discretion

by admitting the evidence to show his lustful disposition toward the victim. But

Citations and pin cites are based on the Westlaw online version of the cited material.

given the strength of the State's evidence, the error was harmless, and Barragan otherwise fails to establish reversible error.[1]  We affirm.

FACTS

After Barragan's adult daughter disclosed longstanding sexual abuse, Barragan faced a jury trial on multiple charges.  Witnesses at Barragan's trial testified about the following events.

Georgina Rocha Herrera (Rocha) and Barragan married in 1993 in Mexico.  The couple's only child in common, G., was born the year after.  When G. was less than a year old, the family moved to Everett, where Barragan had temporary work in the lumber industry.  The move was difficult for Rocha because of the language barrier.

When G. was around seven years old, the family moved to Arlington.  The couple worked opposite schedules and took turns caring for G.  Rocha worked nightshifts while Barragan was home with G. in the evening.

After they moved to Arlington, the couple started a bakery business out of their home.  When G. was around 10 years old, they opened a freestanding bakery in downtown Everett.  At first, Rocha continued to work another job in the mornings.  Barragan took G. home in the afternoon while Rocha stayed at the bakery or worked late in a makeshift home office, often until 1:00 or 2:00 a.m.

Around the time that G. was in the third grade, Barragan began a "nighttime routine" that consisted of gradually escalating sexual abuse.  At first, Barragan would read a story to G. and then appear to fall asleep next to her

---

[1] Because we apply a harmless error analysis, we must engage in a detailed discussion of witness testimony and the substantial evidence supporting the convictions.

while exposing his penis to G. Barragan cut "large hole[s]" in the front of all his underwear "exactly where [his] penis" is, explaining that it made his underwear more comfortable. Barragan allowed G. to touch his penis and started encouraging her to "play with it." Soon after, Barragan placed G.'s fingers on her vagina and showed her how to move them to stimulate herself. After a short period of either stimulating G. or watching her stimulate herself, Barragan began to penetrate her with his finger or perform oral sex on her.

The sexual abuse usually occurred in Barragan and Rocha's bedroom in their bed. If Barragan heard Rocha approach, he told G. to run to her room and pretend to be asleep, saying, "This is our game. This is our secret." Barragan made it "very clear" to G. that she could not tell her mother.

Barragan sometimes bathed with G. and touched her genitals in the bath. Other times, Barragan put G. in the bath by herself and directed her to stimulate herself while he watched. Barragan sometimes placed his computer on the outside of the tub and played animated pornography for G. to watch. One video portrayed two children raping and torturing their babysitter. Barragan did not allow G. to watch any other "normal" cartoons or television.

When G. was young, Barragan called his penis "rubber ducky" and often told her that the rubber ducky "wanted some playing time" or was "missing" her. The sexual abuse started occurring when G. accompanied Barragan during bakery deliveries as well. He would ask her to "pet the rubber ducky," and sometimes G. would either perform oral sex on Barragan or masturbate him while he drove. The types of sexual acts Barragan engaged in with G. expanded

3

over time, and at some point, he began to have anal and vaginal intercourse with her. Barragan had regular sexual contact with G. about four or five times a week for several years.

At first, G. felt "very special" to have a secret with her father, and she was unaware that what they were doing was anything but "fun and games." But over time, the relationship became "more complicated." G. had limited exposure to television and friends as a child. But by the time she was in sixth grade, she saw more television and sometimes visited friends' houses when her parents were busy with the bakery business. G. began "questioning what was going on" and became more "uncomfortable" and unwilling to engage in sexual contact voluntarily.

In response to G.'s increasing unwillingness, Barragan began to use a system of bribery that he called "paying time." "Time would be sexual performances." For instance, to spend time with friends or have new basketball shoes or clothing, G. would have to agree to engage in sexual activity with Barragan for a certain number of minutes. "Chores didn't count for it. . . . Time was its own thing." They used the timer on Barragan's cell phone and he kept a running tally of G.'s debt in the "notes" section of his phone. Barragan required G. to "pay time" throughout middle and high school. He provided G. with "Plan B" birth control every time he ejaculated inside her. G. testified that "ejaculating inside of me . . . always came with Plan B afterwards, always."

G. could not avoid sexual contact with her father by asking her mother for things like money for the movies because Rocha would consult with Barragan as

4

to any request. Rocha testified that she tried to make unified parenting decisions but Barragan would overrule her. Rocha described Barragan as "very strict."

G. changed schools often, including five times during high school. Barragan generally advocated for these changes, claiming that a different school had a better sports team or explaining to Rocha that G. needed to be steered away from "friends who [were] a bad influence." And although Rocha believed that friendship was important, especially because G. was an only child, Barragan did not generally allow G.'s friends to come to the house when she was a child and never allowed boys in the house. Barragan told G. that boys her own age were "losers" and forbade her from having outside sexual relationships because she had to "protect him" from contracting a sexually transmitted disease.

Over time, Barragan ceased to respect the "boundaries" of the "pay time" arrangement. Barragan was unaffected by G.'s complaints or whether she cried throughout the sexual acts. G. physically resisted by positioning her body in a manner that made sexual intercourse uncomfortable for Barragan or intentionally tried to hurt him. But Barragan would "call [her] out for doing it" and "restart the time."

Drugs began to play a major role in securing G.'s submission during her high-school years. When G. was around 15 years old, Barragan discovered her smoking marijuana with two friends. After that, Barragan began to take G. to marijuana stores to purchase hallucinogenic and potent strains of marijuana for her. By using drugs, G. could "numb" and "distract[ ]" herself "from the abuse

5

that was going on at home." And Barragan preferred G. to be intoxicated because it prevented her from being "emotional, crying," or resisting.

G. and Barragan continued to have sexual contact outside the home. They would tell Rocha they were going to the gym and would instead drive to a secluded location, smoke marijuana, and G. would "pay him time" by performing sexual acts in the vehicle. On occasion, G. would also agree to sexual acts in exchange for having a few female friends over. Barragan supplied G. and her friends with alcohol and drugs, including marijuana, ecstasy, acid, or cocaine.

For about six months when G. was still in high school, Rocha went to Mexico to take culinary courses to help the struggling bakery business. Barragan "was supportive" of her leaving. During the time Rocha was in Mexico, Barragan and G. settled into a routine after work, school, and sports of consuming drugs. When she was "numb enough," she would perform the sex acts she "owed" Barragan "because there was no one to stop us."

Rocha and Barragan separated when G. was around 17 years old. Barragan moved into an apartment. G. lived with Barragan following the separation because Barragan told her that she was "a disgraceful daughter," and she felt ashamed and believed that she "did not deserve" to live with her mother.

After graduating from high school, G. often avoided going home. She also ignored Barragan's text messages and phone calls "to come home." When she did go home, she would be in "a lot of trouble" and would "always have to pay time." When they discussed their sexual relationship during this period, Barragan told G. that "it was [her] fault," that she "was like his heroin," and that she "made

him sick" and "addicted" because she "approached" him sexually when she was a child.

In late 2015, Barragan and Rocha travelled to Mexico together to obtain medical treatment and to explore repairing their marriage. However, Rocha suspected Barragan was involved in another romantic relationship and the couple fought. As a result, when they returned to Washington, Rocha demanded that Barragan return an Apple iPhone he was using that belonged to the bakery business. When he did so, Rocha examined the phone, looking for evidence of Barragan's relationship. Instead, Rocha found several videos in a deleted items folder, taken on different days, showing close-up images of G.'s genitalia while she was alone in the bathroom in Barragan's apartment.

The videos appeared to have been taken from the other side of a "vent" in the bathroom and showed the "slats." Rocha recognized G.'s hands and clothing as well as a pair of colored tweezers she bought for G. At the end of one of the videos, the camera direction turns around briefly and shows Barragan's face as he records the video. Rocha saved the items to a folder and kept the cell phone but did not confront Barragan or discuss what she found with G. Rocha explained that she felt she needed to protect G., who was in a "fragile state." Rocha contacted the Everett Police Department and an officer informed her that if the person in the videos is an adult, that person has to make the report.

After Rocha found the videos, she asked G. to move in with her. G., who had spent much time away from Barragan that year during two long trips, "finally felt safe enough to leave" and agreed to move in with Rocha.

After moving in with her mother, G. did not plan to see Barragan. But she changed her mind after Barragan assured her that he could change, told her that "he was going to help himself" so they could have a normal "father-daughter relationship," and made her feel "guilty" about not visiting. G. began to visit Barragan on Sunday evenings. They would eat dinner together, watch the <u>Game of Thrones</u> on television, and G. would sleep on the sofa. Barragan always lent G. the same pajama pants, which were blue with beige stripes. Although Barragan sometimes jokingly asked G. to "pay time," she refused to have sexual contact. Barragan always offered G. marijuana and a margarita, but at first, G. declined alcohol. "[I]t was a while for [her] to feel comfortable accepting a drink from him." Eventually, she accepted his offer of a margarita. Barragan made the drinks out of G's sight in the kitchen and used a small blender and cups that made only individual servings.

Although she had a "pretty high" tolerance for alcohol, G. noticed that after drinking a single margarita at her father's home, she always fell asleep very early, often before the end of the television program. And sometimes when she woke up, her pajama pants were untied, loosened, or the knot differed from the one she had tied the night before. One time, she had a vague recollection of waking up in the middle of the night because she felt "body heat" on her chest and "the pressure of cold lips" on her lips. When she opened her eyes, Barragan was there and moved away very quickly. She then "faded back away into unconsciousness." When she woke up that morning, her pants were "loosely tied" and she "felt pain" in her vaginal area. One evening after several instances

8

of having only one margarita and falling asleep, G. switched her drink with Barragan's while he was not looking. That night, Barragan "passed out early" on the couch and she stayed awake until 4:00 a.m.

Barragan travelled to Mexico in 2018. While he was away, he asked Rocha to help him pay his rent. With his permission, Rocha went to Barragan's apartment to find his checkbook and found a Samsung cell phone in the same nightstand where she found the checkbook. When she picked up the phone, it immediately began to play a video of G. having sexual intercourse with "someone" she was at first unable to identify.

Rocha searched the phone to replay the video and eventually accessed an outside data storage account where she found more sexually explicit videos. She found 10 videos of a woman who was either naked from the waist down or wearing striped drawstring pajama pants pulled partway down. The woman's face and torso were covered and she did not move. The videos showed someone touching the woman's vagina and having sexual intercourse with her, by both digital and penile penetration. Variations in the appearance of the pubic hair in the videos showed that the videos were recorded on different dates. Rocha recognized G. as the woman and Barragan as the person penetrating her based on distinctive physical features and scarring. She also recognized the pajama pants and the location of the videos as the couch in Barragan's apartment.

The first video Rocha found was of G. having sexual intercourse with her boyfriend. The original video was not recorded on the Samsung Rocha found; it

9

was recorded on G.'s phone, which had a distinctive crack in the screen.  The Samsung "video of a video" showed that distinctive crack.  Rocha tried to download and save the videos but when she was unable to do so, she recorded them with her own phone.

When Barragan returned from Mexico, Rocha confronted him about the videos.  Barragan at first suggested that someone else might have placed videos on his phone when he had it repaired.  After Rocha insisted that she knew that he and G. were the people in the videos, he was silent and "didn't say any more words after that.  He ke[pt] quiet."  Rocha told Barragan to stay away from G. and left.  She then told G. about the videos she found.  G. "broke into tears," showed a combination of "panic" and relief, and disclosed the sexual abuse to Rocha.  G. later said she thought she "was going to die" with her secret but felt emboldened to disclose it because there was concrete evidence of the abuse and it was no longer "he said she said."

G. and Rocha contacted the police.  Rocha provided the police with three cell phones—the bakery's iPhone Barragan returned to her after their trip to Mexico, the Samsung cell phone she found in his apartment nightstand, and her own phone that she used to record the videos she viewed on Barragan's phone.  G. confirmed that she and Barragan were the people depicted in the couch videos.

Police officers arrested Barragan.  In a custodial interview recorded after his arrest, Barragan admitted that he took some videos of himself having sexual contact with "a friend of [his]" named "Lori."  He denied that the woman was G.

10

Barragan refused to reveal Lori's identity because he did not "want to expose her." During a search of Barragan's bedroom, police found a bandana covering a hole that led to a nonfunctioning heater vent in the bathroom that tracked the angle and framing of the photographs taken of G.

The State charged Barragan with 14 sexual offenses against G., alleging crimes that occurred between 2001 and 2018. The charges included first degree rape of a child, first degree child molestation, first degree incest, third degree rape of a child, multiple counts of second degree rape based on inability to consent, and multiple counts of first degree voyeurism. The State alleged domestic violence as to each count.

The primary witnesses during the two-week jury trial were G., Rocha, and the lead detective. The jury viewed the videos taken in Barragan's bathroom in 2015 and the videos taken on Barragan's couch after G. moved in with Rocha. The jury convicted Barragan of all 14 counts and returned a special verdict of domestic violence. Barragan's offender score was 39, which yielded a standard sentencing range of 240 to 318 months. The defense requested a mid-range sentence within the standard range. The State requested an indeterminate exceptional sentence of 840 months. The court determined that an exceptional sentence was appropriate because a standard-range sentence would lead to 10 of Barragan's offenses going unpunished as "free crimes" under RCW 9.94A.535(2). The court imposed an indeterminate sentence of 564 months to life on count 1, domestic violence rape of a child in the first degree, and ran the remaining sentences concurrently. Barragan appeals.

ANALYSIS

ER 404(b) Evidence

Barragan challenges the trial court's decision to admit evidence of the Internet browsing history on the cell phone in his possession at the time of arrest. We review the interpretation of an evidentiary rule de novo as a question of law. State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). If the trial court's interpretation is correct, we review the court's admission of evidence under ER 404(b) for an abuse of discretion. DeVincentis, 150 Wn.2d at 17; State v. Foxhoven, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). "Failure to adhere to the requirements of an evidentiary rule can be considered an abuse of discretion." Foxhoven, 161 Wn.2d at 174. Evidence of prior bad acts is presumed inadmissible, and any doubts as to admissibility are resolved in favor of exclusion. DeVincentis, 150 Wn.2d at 17; State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

When police searched the cell phone found on Barragan after his arrest, they found evidence of the recent use of the search term "father plus daughter" on a prominent pornography website. The evidence showed that someone used Barragan's cell phone to access the pornography website and search for videos with titles such as "[t]een siblings fuck in front of Stepmom" and "[f]ather arrives drunk at his house and fucks his teenage daughter with big ass."

Pretrial, the State conveyed its intent to admit the Internet searches as evidence to show Barragan's "lustful disposition" toward G. Barragan opposed admission, arguing there was "no direct link" between the search and G., the

alleged victim, and because the evidence was more prejudicial than probative. The trial court ruled that while the Internet browsing was directed toward daughters in general and not toward G. in particular, it was admissible to show Barragan's lustful disposition toward G. because of the "similarity of the relationship" and because the probative value of the evidence outweighed the prejudice.

ER 404(b) prohibits admission of "evidence offered to 'show the character of a person to prove the person acted in conformity' with that character at the time of the crime." Foxhoven, 161 Wn.2d at 174-75 (quoting State v. Everybodytalksabout, 145 Wn.2d 456, 466, 39 P.3d 294 (2002)). But ER 404(b) does not prohibit evidence of the defendant's prior misconduct for other purposes, such as proving motive, intent, a common scheme or plan, or lack of mistake or accident. State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). One accepted "other purpose" under ER 404(b) is to show the defendant's motive and intent in cases involving sex offenses. Gresham, 173 Wn.2d at 430 n.4. Our courts have consistently recognized that courts may admit evidence of collateral sexual misconduct under ER 404(b) when it shows the defendant's "lustful disposition" directed toward the victim. State v. Ray, 116 Wn.2d 531, 547, 806 P.2d 1220 (1991); State v. Camarillo, 115 Wn.2d 60, 70, 794 P.2d 850 (1990); State v. Ferguson, 100 Wn.2d 131, 133-34, 667 P.2d 68 (1983); State v. Medcalf, 58 Wn. App. 817, 823, 795 P.2d 158 (1990).

To be admissible to show lustful disposition, the evidence must be "directly connected" to the alleged victim. Ray, 116 Wn.2d at 547 (citing Medcalf, 58 Wn. App. at 822-23). The Washington Supreme Court has emphasized:

> "Such evidence is admitted for the purpose of showing the lustful inclination of the defendant toward the offended female, which in turn makes it more probable that the defendant committed the offense charged.
> . . . The important thing is whether it can be said that it evidences a sexual desire for the particular female. . . .
> The kind of conduct receivable to prove this desire at such . . . subsequent time is whatever would naturally be interpretable as the expression of sexual desire."

Ferguson, 100 Wn.2d at 134[2] (quoting State v. Thorne, 43 Wn.2d 47, 60-61, 260 P.2d 331 (1953)).

Here, the court admitted the evidence because Barragan's Internet browsing reflected a sexual interest connected to a particular relationship, which is the same relationship he has with G. But this is not evidence that reveals a sexual desire for a particular individual. See Ferguson, 100 Wn.2d at 134. And it is not sufficient for the evidence to "just reveal [a] defendant's general sexual proclivities"; the fact that evidence shows " 'a sexual desire' " for a " 'particular' " individual is what makes it more likely that the defendant committed the charged offense against that particular individual. Ray, 116 Wn.2d at 547 (citing Medcalf, 58 Wn. App. at 822-23) (quoting Ferguson, 100 Wn.2d at 134). It is simply not enough that the evidence of sexual misconduct shares a common feature with the charged crimes.

---

[2] Emphasis omitted; first and third alteration in original; internal quotation marks omitted.

Here, there is no evidence to suggest that Barragan was searching for depictions of G. Barragan directed his conduct at "daughters" or minors in general but not at G. in particular. Evidence of general lustful disposition toward minors is generally inadmissible. State v. Sutherby, 165 Wn.2d 870, 886, 204 P.3d 916 (2009) (evidence of child pornography not admissible in trial regarding child molestation because it would show only defendant's general predisposition and not his sexual desire for the specific victim). Washington courts recognize a significant distinction between a purpose of "showing [one's] character and action in conformity with that character," and a purpose of showing one's sexual desire for a specific individual and action in conformity with that individualized sexual desire. Gresham, 173 Wn.2d at 425. The admission of Barragan's Internet searches served only the purpose of revealing his proclivities and action in conformity. Because the evidence did not reflect Barragan's lustful disposition toward G. specifically, the court abused its discretion in admitting it.

But error in admitting ER 404(b) evidence "is harmless 'unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " Gresham, 173 Wn.2d at 425[3] (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)); see State v. Gunderson, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014) (nonconstitutional harmless error standard applies to evidentiary error).

Barragan argues that as in Gresham, 173 Wn.2d at 433-34, the evidentiary error here was not harmless because the jury's verdict would have

---

[3] Internal quotation marks omitted.

15

been different but for the admission of the "highly prejudicial" Internet search evidence. There, the trial court erroneously admitted evidence of the defendant's prior conviction for first degree rape of a child in his later trial on four counts of child molestation in the first degree involving a different victim. Gresham, 173 Wn.2d at 417-18. Our Supreme Court held that the error was not harmless because "[m]uch of the testimony at trial was predicated on the fact of Gresham's prior conviction including all of [the first degree child rape victim]'s testimony and much of the [child molestation victim]'s parents' testimony." Gresham, 173 Wn.2d at 433. Without the erroneously admitted evidence, minimal evidence showed that the defendant committed the offense. Gresham, 173 Wn.2d at 433-34.

Barragan also relies on Sutherby. The State charged Sutherby with child rape and molestation involving the same child as well as multiple counts of possession of child pornography. Sutherby, 165 Wn.2d at 875-76. The question before the court was whether defense counsel's failure to move for a severance of the child rape and molestation charges from the pornography charges deprived Sutherby of effective assistance of counsel. Sutherby, 165 Wn.2d at 883. In concluding that Sutherby showed ineffective assistance of counsel, the court relied on, among other things, the fact that the pornography evidence was much stronger than the rape and molestation evidence and that the State consistently relied on the defendant's possession of child pornography to prove that he molested his grandchild. Sutherby, 165 Wn.2d. at 885-86.

16

Barragan's reliance on Gresham and Sutherby is unavailing. Here, the State's evidence supporting each count was overwhelming and the prosecutor only mentioned the Internet browsing history evidence in closing remarks as "corroboration." G.'s extensive and detailed testimony about the abuse, along with the corroborating and highly incriminating video evidence found on the phones that had been in Barragan's possession, persuades us that the effect of the brief testimony about Barragan's Internet browsing history was minimal. The jury had a chance to assess G.'s credibility and weigh all of the evidence. See Camarillo, 115 Wn.2d at 71 (we defer to the trier of fact on issues of conflicting testimony, the credibility of witnesses, and the persuasiveness of the evidence). There is no reasonable probability that the result would have been any different if the court had excluded the Internet browsing history evidence.[4]

Prosecutorial Misconduct

Barragan contends that the prosecutor misstated the evidence during closing remarks and thereby deprived him of a fair trial. Prosecutorial misconduct may deprive a defendant of his guaranty to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012).

---

[4] It does not appear that Barragan requested or the court provided a limiting instruction related to the Internet browsing history evidence. Barragan does not rely on this omission as a basis for his claim of error. In any event, the failure to provide an appropriate limiting instruction upon request is subject to harmless error analysis. See Gresham, 173 Wn.2d at 425. Here, as explained, any error was harmless in view of the strength and nature of the admissible evidence supporting the charges and the relatively minor significance of the browsing history evidence.

To prevail on a claim of prosecutorial misconduct, a defendant must establish that conduct was both improper and prejudicial in the context of the entire case.  State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008).  When, as here, the defendant fails to object at trial, the error is waived absent misconduct so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice.  State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).  To show this level of misconduct, the defendant must show "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.' "  Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

We review statements in a prosecutor's closing arguments in the context of the issues in the case, the total argument, the evidence addressed in the argument, and the jury instructions.  State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).  A prosecutor has wide latitude to draw reasonable inferences from the evidence during closing argument "and to express such inferences to the jury."  Boehning, 127 Wn. App. at 519.  "However, a prosecutor may not make statements that are unsupported by the evidence and prejudice the defendant."  Boehning, 127 Wn. App. at 519.

Here, defense counsel argued in closing argument, among other things, that G.'s demeanor when testifying raised questions about her credibility.  Counsel asserted that if Barragan had raped G. repeatedly since childhood, she likely would have become pregnant.  Defense counsel also suggested that the

theory that Barragan slipped drugs into G.'s drinks to rape her conflicted with her testimony that she could get up for work the next day.

In rebuttal, the prosecutor reviewed the details of G.'s testimony and the evidence corroborating those details. The prosecutor also asserted that the evidence showed Barragan exerted control over the family's life in a manner that facilitated the abuse:

> Ultimately, ladies and gentlemen, [Barragan] orchestrated a life for himself, for his wife, for his daughter that was designed to effectuate his sexual abuse of her.

Specifically, the prosecutor pointed out that Barragan was the driving force behind G.'s frequent changes in schools, which had the effect of limiting her "solid" connections outside the family. The prosecutor also argued that Barragan made sure that Rocha was consistently "busy" with the bakery and "encouraged" her to pursue school and culinary training that took her away from the home.

Barragan claims that this argument was "incendiary and utterly unsupported" by the evidence at trial. He contends the evidence does not show that he unilaterally decided to start the family business, that he influenced Rocha to take classes, or that he "pushed" her to return to Mexico for an extended period to take culinary classes. But the evidence as a whole supports a reasonable inference that Barragan used his control over the family dynamics to facilitate his abuse of G.

According to both G.'s and Rocha's testimony, Barragan was "very strict" and largely made the decisions affecting G., including those about her privileges, schooling, and having friends over at their house. This furthered Barragan's

19

ability to force G. to submit to his sexual demands using a system of bribery and ensured that she lacked strong connections outside the household. The testimony also suggested that Barragan kept G. close to him and, at the same time, drove a wedge between G. and Rocha during G.'s childhood and adolescence. G. testified that the "games" and "secret[s]" Barragan designed during her childhood made her feel closer "with my father. He gave me a false sense of security." As she got older and tried to resist Barragan's sexual advances, he told her that she was a "disgraceful daughter" who "didn't deserve" to live with Rocha. He also provided drugs to G. to "numb" her resistance.

And, according to the record, the impetus behind opening a bakery came from Barragan. Rocha testified that after a friend suggested that they open a bakery in their home, Barragan came home from work one day and "told me that he quit . . . the lumber [job] and he will start to put everything to open the bakery." Further, the bakery business created an opportunity for abuse that Barragan could capitalize on. When G. was a child, she was alone with Barragan while Rocha worked late, and he took only G. with him during deliveries so he could sexually assault her in the van. The evidence supported the State's argument and the remarks were not improper.[5]

Community Custody Condition

Barragan argues that the court imposed a vague and ambiguous condition of community custody. "A trial court necessarily abuses its discretion if it

---

[5] Barragan also claims that his counsel performed deficiently by failing to object to the prosecutor's remarks. However, because the challenged remarks were not improper, defense counsel was not deficient for failing to object.

imposes an unconstitutional community custody condition, and we review constitutional questions de novo." State v. Wallmuller, 194 Wn.2d 234, 238, 449 P.3d 619 (2019).

A community custody condition is unconstitutionally vague under due process principles of the Fourteenth Amendment to the United States Constitution and article I, section 3, of the Washington Constitution if a reasonable person would not understand what conduct the condition prohibits or if it lacks ascertainable standards that prevent arbitrary enforcement. State v. Wallmuller, 194 Wn.2d 234, 238-39, 449 P.3d 619 (2019); State v. Casimiro, 8 Wn. App. 2d 245, 250, 438 P.3d 137, review denied, 193 Wn.2d 1029, 445 P.3d 561 (2019).

The challenged condition bans Barragan from locations where "children's activities regularly occur or are occurring" and provides:

> Stay out of areas where children's activities regularly occur or are occurring. This includes, but is not limited to: parks used for youth activities, schools, daycare facilities, playgrounds, wading pools, swimming pools being used for youth activities, play areas (indoor or outdoor), sports fields being used for youth sports, arcades, church services, restaurants, and any specific location identified in advance by [the Department of Corrections] or [community corrections officer].

Our Supreme Court determined that a similar community custody condition was not unconstitutionally vague in Wallmuller, 94 Wn.2d at 245. That condition provided, " 'The defendant shall not loiter in nor frequent places where children congregate such as parks, video arcades, campgrounds, and shopping malls.' " Wallmuller, 194 Wn.2d at 237. The court reasoned that

21

" 'commonsense' restrictions, including those that use nonexclusive lists to elucidate general phrases like 'where children congregate,' " provide fair notice of prohibited conduct.  Wallmuller, 194 Wn.2d at 242-43.

Much like the condition in Wallmuller, the condition here uses a nonexclusive list to illustrate the general phrase "areas where children's activities regularly occur or are occurring."  The phrase "areas where children's activities regularly occur" is no less precise than "places where children congregate" as addressed in Wallmuller.  The language here is specific enough that a person of ordinary intelligence can understand the scope of its prohibition.

Barragan asserts that the "illustrative list" is "confusing" because it includes some "child-specific" locations like schools and some "mixed-use" locations like parks, but only some of the "mixed-use" locations are expressly modified with the language "used for youth activities."  But the first sentence modifies the entire illustrative list and eliminates any ambiguity—the locations are limited to "areas where children's activities regularly occur or are occurring."  Furthermore, the condition the Supreme Court upheld in Wallmuller also included areas not exclusively used for children's activities, such as shopping malls.  Wallmuller, 194 Wn.2d at 237.  The condition here is not unconstitutionally vague.

Barragan also suggests that the condition is flawed because it implicates "fundamental constitutional rights."  In making this argument, we assume he refers to the right to the free exercise of religion.  A community custody condition that burdens the free exercise of religion must withstand strict scrutiny.  State v.

Balzer, 91 Wn. App. 44, 53, 954 P.2d 931 (1998). "Under this standard, the complaining party must first prove the government action has a coercive effect on his or her practice of religion." Balzer, 91 Wn. App. at 53. Barragan did not object to the condition below. And while he maintains that it "potentially affects essential human needs and rights," Barragan does not argue or point to any evidence that the condition has a coercive effect on his practice of religion. Because of the limited briefing and undeveloped record, we conclude that the question of whether this condition unconstitutionally burdens Barragan's freedom of religion is not squarely before us.[6]

We affirm Barragan's jury conviction of 14 sex offenses against his biological daughter.

_____
Brennan, J

WE CONCUR:

_____          _____
Dwyer, J.

---

[6] Barragan asserts without elaboration that the condition is also not crime-related. But he agreed to the community custody condition without objection, inviting any resulting error, and cannot argue for the first time on appeal that it is not crime-related. See Casimiro, 8 Wn. App. 2d at 248-49; RAP 2.5(a)(3); see also State v. Peters, 10 Wn. App. 2d 574, 591, 455 P.3d 141 (2019) (declining to consider an argument that a sentencing condition is not crime-related when the defendant raised the issue for the first time on appeal).