IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32606-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAUL LOPEZ SOTO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Appellant Raul Lopez Soto claims the prosecution engaged in misconduct when the State, in summation, referenced a detective's belief in the validity of the criminal charges and characterized Lopez Soto's theory of the case as "desperate" and "ludicrous." We decline reversal of the convictions because Lopez Soto invited testimony from the detective that the detective believed the charges and because Lopez Soto forwarded no objections during closing arguments.

FACTS

In October 2012, ten-year-old Maria lived in Grandview with her mother Alma Torres, brother Carlos, and sister Evalinne Torres. Maria and Carlos are fictitious names since the two are minors. Evalinne's boyfriend, appellant Raul Lopez Soto (Lopez), also

lived with the family.

According to an earlier report by Maria, around Halloween 2012, Raul Lopez played what he called "the candy game" with her. Lopez covered Maria's eyes with a t-shirt and told her to identify the "candy" he inserted in her mouth. Lopez then placed his penis in Maria's mouth. Days later Lopez played his "game" again in the backyard of the family's Grandview home. He put his penis in Maria's mouth again. Later Lopez played his game a third time in the basement of the home, but Maria summarily loosened the blindfold from her eyes and spied Lopez removing his penis from his trousers. Maria told Lopez to stop and not to play the candy game anymore. Lopez ended the attempt at a third game and did not try to play the game with Maria again.

On July 23, 2013, Raul Lopez and Carlos bickered after Carlos called his sister, Evalinne, a bitch. Lopez and Alma Torres also argued. To end the conflict, Alma ferried Carlos and Maria to their uncle's house in Prosser on her way to work. On the short journey to Prosser, Maria disclosed to her mother the candy game Lopez played with her. Alma immediately returned to the Grandview home and confronted Lopez. Lopez admitted playing a candy game with Maria, but maintained he inserted actual candy in Maria's mouth. Lopez vehemently denied sexually assaulting Maria.

During the evening of July 23, 2013, mother Alma Torres called the Grandview Police Department and reported Raul Lopez's assaults on Maria. On August 8, 2013, Darla Jensen, a child interviewer, conducted an interview of Maria, who described the

2

candy game incidents, including a physical description of Lopez's penis. On August 9, 2013, police interviewed Lopez, who admitted to placing candy in Maria's mouth during the time period she identified, but denied sexually assaulting her. Lopez stated that Maria could describe his penis because she walked into the bathroom while he urinated.

## PROCEDURE

The State of Washington charged Raul Lopez with two counts of first degree rape of a child and one count of attempted first degree rape of a child. Thereafter Lopez and the State discussed a time for the defense to interview Maria and Alma Torres. Alma Torres stopped communicating with the State prosecutor's office and stated she would not allow Maria to testify at trial. Torres maintained that Maria desired to forget the incidents.

The State and Raul Lopez scheduled interviews of Maria and Alma Torres, despite the women's reluctance to cooperate, for March 4, 2014, but Lopez cancelled at the last minute. Alma and Maria Torres traveled to the interview site when the State called to tell them it was cancelled. During this phone call, Alma told the prosecutor's office that Maria told her she did not see Lopez's penis on the third attempted candy game. The State maintains it told Lopez's attorney about this comment from Alma Torres between March 4, 2014 and March 20, 2014. Lopez insists the State never forwarded the information.

On March 20, 2014, the defense interviewed Maria and Alma Torres. During the interview, Maria stated she may have imagined or dreamed the candy games.

During trial, Maria testified, but did not remember anything she said in her August 8, 2013 interview with Darla Jensen. Maria recalled even less about the candy game incidents. The court allowed the State to play for the jury the video recording of the Jensen interview of Maria.

During trial, Grandview Police Department Detective Jose Martin testified. Detective Martin responded to Alma Torres' report that Raul Lopez sexually assaulted Maria. On cross-examination, Lopez's attorney questioned Martin's impartiality in investigating the crime:

Q. You said that you drove mom and the victim to the courthouse?
A. I did.
Q. Who's the victim?
A. [Maria].
Q. You had already made up your mind about that?
A. It was reported that way. I'm just identifying her.
Q. There wasn't anything in the interview that convinced you that she wasn't the victim?
[Prosecutor]: Objection.
THE COURT: I'm going to overrule it.
[Prosecutor]: Okay.
A. Can you ask the question again.
Q. (By Mr. Dold [Defense counsel]) There wasn't anything in the interview that convinced you she wasn't the victim?
A. Well, based on my training and experience, and I can honestly say that I believe she was a victim.
Q. Yes. So if I understood your comments correctly, when you spoke to Officer Arraj, your first concern was the safety of [Maria]?
A. Correct.

No. 32606-3-III
*State v. Lopez Soto*

Verbatim Report of Proceedings (VRP) at 277-78.

Later, outside the presence of the jury, the trial court clarified the purpose and

effect of the colloquy between defense counsel and Detective Jose Martin:

> THE COURT: Now, I've got that part nailed down. Let me go back for one moment here. There was a couple objections I wanted to make a quick reference to. It was during Detective Martin's testimony, actually cross-examination. I just want it to be clear.
> Mr. Dold, and it's my words, essentially invited Officer Martin to comment on guilt or innocence as far as I was concerned, whether he believed [Maria] or felt her to be a victim.
> MR. DOLD: Correct.
> THE COURT: I would not have allowed that under any other circumstances. I want the record to be clear that that testimony was brought forth by you, and he was responding to questions that you specifically directed him to respond to.
> MR. DOLD: I asked the same question of Ms. Wahl.
> THE COURT: Exactly. Thank you for clearing that up. I wanted to make sure that the record stood solid in that regard.

VRP at 327-28.

At closing, the State commented on the defense's cross-examination of Detective

Jose Martin and on Maria's testimony:

> Now, we heard testimony elicited by the defense that Detective Martin -- it was an impact on him and he saw it. This experienced detective looked at that interview, and at that point where he had had an open mind he saw it, and he believed. He knew that this was true. A girl of that age and sophistication would not be able to describe things the way she did, how she did it in those kind of sensory details in the way she did and keep everything straight and see it the way she did.
> . . . .
> The defendant desperately tried to throw out explanations that were, frankly, the evidence will show and common sense, were not true. It's just

5

born out of desperation. Of course, she would know what a male penis would look like. I never lock the door. Everybody has walked in on me. It doesn't matter. It's my house. I can do what I want. It doesn't matter if there's little kids running around or my mother-in-law. It's my house, my house. Does that ring true? What does that say when you throw something so ludicrous and desperate out there?

. . . .

Nobody else saw this candy game. He wanted some little kernel that he could -- oh, this must have stemmed out of that. It must stem out because I am getting -- well, they're leaving. Clearly make them more mad at me and then they'll come back. Again, excuses born out of desperation that does not hold true.

This young girl, was she telling the truth in that interview? This girl, you saw in a much different situation in front of the stand, looking upon us and shutting down, almost going catatonic.

. . . .

I'll leave you with this: The way she described it to Darla Jensen and all that detail, all that struggling to describe something that has different aspects, do you have a reasonable doubt that that occurred the way she said it, the way she described it, the way she motioned, how much in torment meant that made her? You are the sole judges of the credibility. Do you understand what's happened, what this issue of delayed disclosure caused and the same factors that came to bear as I started this case? I ask that you all take that into consideration.

VRP 352-54, 358-59.

Raul Lopez argued at closing:

[Maria] never said he put his penis in my mouth. When I asked her sitting here in the courtroom, you realize that I was the only one that asked that question. Nobody else asked that question. Nobody else wanted to know the answer to that question because they assume -- the victim advocate assumes the children are telling the truth. That's her job, to be supportive, not to question.

It's the same exact training that Darla Jensen has, exactly the same training. So instead of doing child advocacy, which that she does most of the time, she's now doing one of the 15 interviews she's ever done. She's still doing advocacy.

6

The officer, the same training. He knows that he's not going to get an admission from her because he's a guy. So they're setting up the best possible way of getting [Maria] to tell this story.

When he goes and talks to my client, with all of his training and interrogation, etcetera, etcetera, etcetera, he told you about that training. He is absolutely convinced that my client is guilty not because she said he put the penis in my mouth but because of this great big, dark secret that the state started their opening with and began their closing with, this secret, this delayed disclosure, which means absolutely nothing, absolutely nothing.

. . . .

Everybody started with the proposition that my client was guilty. They worked from that proposition to try and prove it. The results of that is what got played out during the trial.

. . . .

The state's case is on trial. It's not [Maria] that's on trial. It's her statements that are on trial. What they prove beyond a reasonable doubt.

God love her. She's a lovely little girl, had a great interview with her. She was polite. She was friendly. She was cheerful.

[Prosecution]: Objection, facts not in evidence.

THE COURT: Sustained.

[Defense]: You had a chance to meet her. In none of the interviews did [Maria] say—

[Prosecution]: Objection.

THE COURT: Sustained.

VRP at 360, 365, 367.

In rebuttal, the State argued:

If this is some utopia where everything is just perfect and this is the first big argument that they ever had, an argument that didn't result on blows being thrown, just upset at someone using the "B" word, well, that never happens in any household. That's suddenly going to result in them never coming back to a house that they've been at most in about a year, and a girl is going to expose this? That's what she's going come up with, not the scissors incident or pushing or hitting or pinching, that suddenly I had some guy's penis in my mouth? Ludicrous. Does that make any sense whatsoever when you actually lay it out like that? No, it doesn't. That's why it wasn't explained logically because it's ludicrous.

7

Is the girl that got up on the stand, that unsophisticated, meek little girl capable of saying what she said to Darla and all that detail if it did not happen? Is there any wonder that—it's blame. Is there any wonder that after the detective, who kept an open mind, didn't really know a lot of the details, then sees that interview, who wouldn't go into talking to the defendant after witnessing that and knowing the truth of what the girl said, with all those details? That is not something you see, is it? Do you expect that of ten-year old girls? Of course not.

This ludicrous story that the defendant puts forward that it must be to somehow to get a home back that they're never going to lose.

VRP at 370-71. Raul Lopez made no objections during the State's closing and rebuttal arguments.

The trial court instructed the jury, in part, as follows:

You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness. In considering a witness's testimony, you may consider these things: the opportunity of the witness to observe or know the things he or she testifies about; the ability of the witness to observe accurately; the quality of a witness's memory while testifying; the manner of the witness while testifying; any personal interest that the witness might have in the outcome or the issues; any bias or prejudice that the witness may have shown; the reasonableness of the witness's statements in the context of all of the other evidence; and any other factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony.

The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

Clerk's Papers at 23.

8

The jury found Raul Lopez guilty of all three charges, two counts of first degree rape of a child and one count of attempted first degree rape of a child. The trial court sentenced Lopez to 162 months to life confinement on each count of rape and 121.5 months to life confinement on attempted rape, with all sentences to run concurrently.

## LAW AND ANALYSIS

Raul Lopez contends that the State committed prosecutorial misconduct during its closing and rebuttal arguments by referencing Detective Jose Martin's disbelief in Lopez's innocence and commenting on Maria's credibility as a witness. Lopez also contends that it was misconduct for the State to call his defense theory "ludicrous." He asks this court to reverse his convictions, and remand for a new trial.

The State contends that Lopez waived this assignment of error because he did not object during the State's closing argument or rebuttal. The State also argues that its conduct during closing argument did not rise to the level of misconduct. Finally, the State argues that Lopez can show no prejudice. We hold that Lopez waived any error and affirm his convictions.

Raul Lopez acknowledges that he did not object to any of the prosecution's comments during closing argument. Lopez argues that he did not waive his claim of prosecutorial misconduct because the conduct irrevocably prejudiced his case.

A prosecutor enjoys wide latitude in drawing and expressing reasonable inferences from the evidence during summations. *State v. Gentry*, 125 Wn.2d 570, 641, 888 P.2d

9

1105 (1995). Nevertheless, a prosecutor's remark is improper if he or she misstates the applicable law, shifts the burden to the defense, mischaracterizes the role of the jury, or invites the jury to determine guilt on improper grounds. *State v. Emery*, 174 Wn.2d 741, 759-60, 278 P.3d 653 (2012); *State v. Boehning*, 127 Wn. App. 511, 522, 111 P.3d 899 (2005). This court reviews a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Boehning*, 127 Wn. App. at 519. A defendant claiming prosecutorial misconduct must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. *State v. Emery*, 174 Wn.2d at 756. Even if the defendant shows the comments were improper, the error does not require reversal unless the appellate court determines there is a substantial likelihood the misconduct affected the jury's verdict. *Gentry*, 125 Wn.2d at 641.

If a defendant did not object to a prosecutor's alleged misconduct at trial, the defendant waives any error unless the misconduct was so flagrant and ill intentioned that a jury instruction could not have cured the resulting prejudice. *Gentry*, 125 Wn.2d at 596. Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured. *Emery*, 174 Wn.2d at 762. Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on the

jury and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. *Emery*, 174 Wn.2d at 761. Because Raul Lopez did not object during closing argument, he bears the burden on appeal to demonstrate that the State's comments were so prejudicial that no curative instruction could have remedied their effect and that the comments had a substantial likelihood of affecting the jury verdict.

This court first decides whether a curative instruction could have obviated the effect of the prosecutor's statements. Raul Lopez cannot surmount this first hurdle. Lopez tersely contends that referencing Detective Jose Martin's testimony, commenting on Maria's credibility as a witness, and calling the defense's theory "ludicrous" were irrevocably prejudicial. Nevertheless, Lopez does not explain why the prosecutor's comments were prejudicial in the context of the trial's entirety. As explained below, all of the alleged transgressing remarks could have been, and in some cases were, neutralized by curative instructions from the trial court.

The prosecutor's references to the testimony elicited from Detective Jose Martin during Raul Lopez's cross-examination were proper. As the State posits, Lopez opened the door to such commentary when he placed Martin's belief about Lopez's guilt at issue during his cross-examination. The State commits no reversible error by informing the jury of testimony the defense elicited. *State v. Thorgerson*, 172 Wn.2d 438, 449, 258 P.3d 43 (2011). The trial court clarified with Lopez, outside the presence of the jury, that Lopez raised the issue of Martin's belief about his guilt. Confronting a law enforcement

officer with his early belief in the guilt of the defendant and veracity of the victim is often a wise defense tactic in that the strategy portrays the officer as slanting his investigation to only one conclusion, the culpability of the defendant. As shown by Lopez's closing argument, Detective Martin's allegedly predisposed belief in his guilt was a key part of Lopez's theory of the case. Nevertheless, this tactic frees the State to comment on the defense strategy.

Any potential prejudice created by the prosecutor's passing reference to Maria's credibility as a witness was neutralized by the prosecutor's own statements during closing argument and the trial court's instructions to the jury. The prosecutor never personally vouched for the credibility of Maria, and the prosecutor told the jury that it was the sole judge of the credibility of the witnesses. The trial court instructed the jury that it was the sole judge of the credibility of Maria and others. Juries are presumed to follow the trial court's instructions, absent evidence proving the contrary. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007).

The prosecutor's comments that Raul Lopez's theory of the case was "ludicrous" and "desperate" were also capable of cure by a jury instruction and likely do not even constitute improper statements. The trial court instructed the jury to disregard both attorneys' statements insofar as summations might be misconstrued as evidence. Moreover, our Supreme Court has expressly found use of the words "desperate" and "ludicrous" insufficient to create prejudice and warrant a new trial.

12

In *State v. Thorgerson*, 172 Wn.2d 438 (2011), our high court wrote that describing a defense theory as "desperate" and "bogus" was likely improper, but did not prejudice Thorgerson such that no curative instruction could cure the damage. In *State v. Brown*, 132 Wn.2d 529, 566, 940 P.2d 546 (1997), our Supreme Court found the prosecutor's description of a defense theory as "ludicrous" was reasonable in light of the evidence. In *Brown*, a capital case, the defense argued that Cal Coburn Brown did not have a motive to kill the woman he kidnapped, raped, and tortured for several days, because she was asleep while Brown telephoned an airline to make his getaway. The Court held: "The use of the word 'ludicrous' was simply editorial comment by the prosecuting attorney which was a strong, but fair, response to the argument made by the defense." *Brown*, 132 Wn.2d at 566.

The prosecutor's characterization of Raul Lopez's theory of the case as "desperate" and "ludicrous" was, as in *Brown*, uttered in response to a strong closing argument by the defense. In light of the defense's theory that Maria manufactured the story in order to prevent her family from moving out of their house they shared with Lopez, the prosecutor's response was fair.

## CONCLUSION

Raul Lopez waived any contention that purported prosecutorial misconduct requires a new trial. We affirm his three convictions.

13

No. 32606-3-III
*State v. Lopez Soto*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Brown, J.