# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59335-1-II |
| Respondent, | |
| v. | |
| DONALD FRANCIS ZERGMAN, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J.—Donald Zergman appeals his conviction of failure to register as a sex offender, arguing that (1) there was insufficient evidence to sustain his conviction, (2) Zergman was deprived of his right to a fair trial because the prosecutor engaged in misconduct; (3) Zergman received ineffective assistance of counsel; (4) the trial court abused its discretion in giving a missing witness instruction for Zergman's girlfriend; and (5) cumulative error was sufficiently prejudicial to warrant giving Zergman a new trial.

We hold that sufficient evidence supported Zergman's conviction for failure to register, but the trial court abused its discretion by giving a missing witness instruction and the error was not harmless. Because we reverse on this basis, it is unnecessary to reach Zergman's contentions of prosecutorial misconduct, ineffective assistance of counsel, and cumulative error.

FACTS

I. BACKGROUND

Donald Zergman is a convicted sex offender[1] and is thus required by Washington law to register with the Clallam County Sheriff's Department under RCW 9A.44.130.

Zergman began residing with his girlfriend, Eleta "EJ" McClary-Wise, in her unit at Hilltop Ridge Apartments in July 2022, but was not listed on the lease agreement. A few months later, McClary-Wise received a letter from Diane Johnson, the manager of Hilltop Ridge. The letter notified McClary-Wise that all residents of a unit must either be added to the lease agreement or vacate. McClary-Wise completed an application to add Zergman to the lease, but Zergman was denied because he failed the background check. Subsequently, Johnson notified McClary-Wise of the denial and informed her that Zergman could not reside in the apartment.

Based on her personal observation, Johnson believed that Zergman continued to reside in the unit. She contacted the Clallam County Sheriff's Department to inform them Zergman could not register as a resident of Hilltop Ridge in January 2023. Thereafter, Zergman changed his sex offender registration to "transient," indicating he lacked a fixed residence. Verbatim Rep. of Proc. (VRP) at 300. As required for transient registrants under RCW 9A.44.130(6)(b), the sheriff's department instructed Zergman to report weekly with an accounting of where he had spent the previous week.

Johnson continued to observe Zergman at Hilltop Ridge. Johnson contacted the Clallam County Sheriff's Department to report this, and Detective Brandon Stoppani visited Hilltop Ridge to investigate. In the accountings filed with the Sheriff during summer 2023, Zergman reported he

---

[1] Zergman was convicted of a juvenile felony sex offense in 1997.

stayed at three different units at Hilltop Ridge in addition to McClary-Wise's unit. There were 16 entries between July 4, 2023 and August 14, 2023, in which Zergman reported staying with Hilltop Ridge residents other than McClary-Wise. In July, Detective Stoppani interviewed Johnson and Lilian Connor, a relative of Zergman and one of the people Zergman reported staying with. Connor told Detective Stoppani that Zergman had not stayed in her unit.

Detective Stoppani returned to the premises to interview Connor, Katherine Allen, Katherine Olson, and Cody Thompson, residents of Hilltop ridge that Zergman reported staying with during the period of July 4 to August 14. In front of Johnson, who was present during all of their interviews, the residents all stated that Zergman had not stayed in their units, and they believed him to be staying in McClary-Wise's unit. Detective Stoppani also contacted McClary-Wise, who denied that Zergman was living with her.

Based on Detective Stoppani's investigation, Zergman was charged with one count of failure to register as a sex offender for knowingly failing to "keep an accurate accounting of where he . . . stay[ed] during the week and provide it to the county sheriff upon request." Clerk's Papers (CP) at 75.

## II. TRIAL

Prior to trial, the parties stipulated that Zergman was convicted of a juvenile sex offense, had a duty to register, and had been convicted of a prior felony failure to register. At trial, the question posed to the jury was whether Zergman knowingly failed to comply with the requirement of sex offender registration to provide an accurate accounting to the sheriff of where he stayed during the weeks in question upon the sheriff's request.

A. STATE'S WITNESSES

The State called Johnson as its first witness. Johnson testified that during the months of July and August 2023, she would see Zergman's vehicle parked at Hilltop Ridge in the morning when she arrived and in the evening when she left. She testified that she "never knew him to be at any other apartment but [McClary-Wise's unit]." VRP at 206.

The State also called four residents of Hilltop Ridge with whom Zergman reported staying between July 4, 2023 and August 14, 2023. Lilian Connor, Zergman's relative, testified that she lived in unit C1, a two-bedroom apartment, with her son. Zergman reported staying in unit C1 on at least five occasions. Connor testified that although Zergman would come by to visit and may have had a key to her unit, he never stayed at her apartment during July and August. She stated that he would "come in and visit for about five seconds or so and then he'd take off" to McClary-Wise's unit. *Id.* at 217.

On cross-examination, Connor testified that even prior to July and August 2023, Zergman had never slept in her unit. Zergman submitted an exhibit of a signed statement that Connor gave to Johnson in January 2023, stating that Zergman was staying in her unit as a guest. Connor testified that Zergman had asked her to write the statement, but that it was inaccurate. Connor recounted that in August she met with Detective Stoppani and Johnson in Johnson's office. Connor affirmed that by "August [she was] hoping to get Mr. Zergman from . . . spending any time at the property" because "he's a pedophile." *Id.* at 222. On redirect, Connor admitted that she did Zergman a favor by writing the statement but regretted it because she was afraid she was "going to be in trouble," but not for any other reason. *Id.* at 224.

4

The State then called Katherine Allen, a resident of unit C4. Allen testified that she had a neighborly relationship with Zergman, and would see Zergman leaving McClary-Wise's unit in the morning in his work clothes with coffee and returning in the afternoon. She would occasionally see Zergman visit Connor in unit C1, but never saw him coming out of any other unit. Allen further testified that Zergman had not spent the night in her apartment during July and August.

On cross-examination, Zergman submitted an exhibit of a signed statement that Allen wrote, stating Zergman was staying at her apartment certain days of the week. According to Allen's testimony, McClary-Wise asked her to write a statement that McClary-Wise could provide to Johnson. Allen testified that her written statement was false, but that her testimony in court was true. Allen testified she felt "disgusted" about writing the statement because "[she] lied." *Id.* at 235. Allen testified that Connor called her to inform her that Allen "was in trouble" and Johnson wanted to see her in the Hilltop Ridge office. *Id.* at 234. She went to the office to answer Detective Stoppani's questions with Connor and Johnson present.

The State then called Katherine Olson and her partner, Cody Thompson, who are residents of unit C5. Both Olson and Thompson testified that no one stayed in their unit during the summer of 2023, and only they had keys to their unit. According to Olson and Thompson, they believed that Zergman lived in unit C3 with McClary-Wise based on how regularly he and his truck were at Hilltop Ridge. Olson testified that she would smoke cigarettes outside late at night, and would interact with Zergman during that time. Thompson would interact with Zergman when leaving for work in the morning. Olson and Thompson testified that they never or "[n]ot really ever" saw Zergman coming out of Connor's unit. *Id.* at 250. Olson testified that Zergman would occasionally

5

visit Allen's unit but never at night. Olson and Thompson further testified that Zergman came into their unit only once for approximately 20 minutes.

On cross-examination, Zergman elicited testimony that Johnson was present for each of the interviews her tenants had with Detective Stoppani. As with the State's other witnesses, the defense sought to discredit the residents' testimony by implying that they were motivated to lie to Detective Stoppani because of Johnson's presence.

B. DEFENSE WITNESSES

Zergman testified in own his defense. He corroborated Johnson's testimony that McClary-Wise had attempted to add him to her lease agreement and that she failed because Zergman did not pass his background check. He testified that he had stayed with various residents at the Hilltop Ridge Apartments, with McClary-Wise, and in Oregon for a weekend. Zergman testified that he typically finished work after Johnson had left Hilltop Ridge for the day.

During cross-examination, the State asked Zergman about his relationship with McClary-Wise. He testified that he considered McClary-Wise his wife, although they were legally married to other people. Zergman also stated that he watched McClary-Wise's three children while she was at work, typically until around midnight. Then the State asked Zergman about the testimony of the State's witnesses:

> Q. And you heard, um, Ms. Allen's testimony as, as well, right?
> A. Yes.
> Q. Um, that you have not stayed at her place once over the summer --
> A. -- I heard that testimony, yes.
> Q. -- in 2023? Kay. Uh, and, uh, your testimony is that you did stay there?
> A. Yes.
> Q. And that she was lying?
> A. Yes.
> Q. Kay. And your testimony is that you stayed at Ms. Olson and Mr. Thompson's place, correct?

A. Yes, one time.
Q. And that, and that they're also lying, correct?
A. Yes.
Q. And your testimony is that you stayed at Ms. Conner's place for a number of times --
A. -- Yes.
Q. -- correct? Over the summer months of 2023.
A. Yes.
Q. And Ms. Conner is also lying?
A. Yes.

*Id.* at 313-14.

Zergman called other witnesses that attested to him staying at his trailer stationed on a friend's property. A coworker's girlfriend testified that she would drop Zergman off at the trailer after work, around 5:00 PM. Kirk Schoville, the property owner's son, testified that Zergman was at the trailer "two to three times a week." *Id.* at 328. Schoville testified that he didn't recall McClary-Wise ever contacting him and encouraging him to say anything specific to police about where Zergman stayed. However, on cross-examination, the following exchange occurred:

Q. . . .[D]id you receive a text message from Ms. McClary-Wise on that day saying, "If the cops show up or call Donnie -- or call, Donnie stays in the trailer a few times a week." Did you get that tex-, text message?
A. I don't recall that. That was --
Q. -- Okay. And later on that day did you receive a message from Ms. McClary-Wise saying, "That was me you saw waiving from Donnie's truck. They arrested him so I had to go get the truck, which reminds me if the cops ask on the nights that Donnie stays there, I dropped him off, the truck is never with him." Did you get that message from Ms. McClary-Wise?
A. I don't recall that.
Q. Okay. And then the following day, did you get a message from her saying, "Right, but all he has to do is tell them Donnie stays there a few nights a week -- few nights, we can leave him alone and that bc" -- which I am assuming is because -- "[sic] the cars keep getting broken into, he doesn't keep the truck there." Did you get that text message from her?
A. (No audible response)

Q. Mr. Schoville, did you get that text message from her? Can you please answer the question, Mr. Schoville?
A. (No audible response)
Q. Mr. Schoville --
A. -- I.
Q. -- are you able to answer that question?
A. (No audible response)
Q. It's a yes or no --
A. -- No.
Q. -- did you get text message from her?
A. (No audible response)
Q. Are you unwilling to answer the -- my question, Mr. Schoville --
A. -- I don't know how to answer that.
Q. Okay. It's a yes or no. Did you get that text message from Ms. McClary-Wise --
A. -- Yes, I did.
Q. What?
A. (No audible response)
        THE COURT: Sir, I just need you to answer out loud. We record the, the answers.
BY THE WITNESS:
A. Yes, I did. But that's not what that was for pretty much.

*Id.* at 331-32.

C. MISSING WITNESS INSTRUCTION

At the conclusion of the presentation of evidence, the State asked the trial court to give a missing witness instruction because Zergman did not call McClary-Wise to testify. According to the State, McClary-Wise "would have intimate knowledge of Mr. Zergman's whereabouts" and "[t]he defense had an ample opportunity to call [McClary-Wise] to testify and failed to do so." *Id.* at 342. The State further argued that the instruction "provide[d] a framework for the State to argue the defense put on a[n] insufficient case without burden shifting." *Id.* at 345.

Zergman objected, arguing McClary-Wise had "been available" to the State as a witness and would not have any independent knowledge regarding whether Zergman stayed with the other residents. *Id.* at 343. Prior to trial, Zergman had informed the State that he did not intend to call

McClary-Wise. McClary-Wise was also present in the courtroom for the duration of the trial. Therefore, Zergman argued McClary-Wise was not particularly available to the defense.

The trial court granted the State's request, finding that Zergman and McClary-Wise had a community of interest; Zergman had a superior opportunity to know what her testimony would be; and McClary-Wise's testimony was material because she could testify to whether Zergman spent the nights in question at her apartment. The instruction provided that:

> If a person who could have been a witness at the trial is not called to testify, you may be able to infer that the person's testimony would have been unfavorable to a party in the case. You may draw this inference only if you find that:
> (1) The witness is within the control of, or peculiarly available to, that party;
> (2) The issue on which the person could have testified is an issue of fundamental importance, rather than one that is trivial or insignificant;
> (3) As a matter of reasonable probability, it appears naturally in the interest of that party to call the person as a witness;
> (4) There is no satisfactory explanation of why the party did not call the person as a witness; and
> (5) The inference is reasonable in light of all the circumstances.

CP at 61 (Instruction No. 9).

D. CLOSING ARGUMENTS

In light of the trial court granting the missing witness instruction, the State questioned why the defense did not call McClary-Wise:

> The first question I have for you is where's Eleta [McClary-Wise]? Where's Mr. Zergman's wife? Why didn't she testify? She's in [unit] C3 every night. She'd have a pretty good idea if Mr. Zergman was staying there. She'd also have a pretty good idea since she's so close of whether Mr. Zergman's staying in C1, or C4, or C5.

VRP at 366.

In response, defense counsel pointed out in his closing argument that McClary-Wise was equally available to the State and asked if the State believed McClary-Wise's testimony would be damaging to Zergman's case, "why didn't the State call the witness?" *Id.* at 379.

9

On rebuttal, the State further urged that "if anyone compromised Ms. Allen and Ms. Connor, it was Eleta McClary-Wise when . . . she had them write these letters. And then these letters were weaponized against them at this trial." *Id.* at 383.

A jury found Zergman guilty of failure to register. Zergman appeals.

DISCUSSION

I. SUFFICIENCY OF THE EVIDENCE

Zergman argues that RCW 9A.44.130(6)(b) does not require transient sex offenders to report their location during the previous week; it simply authorizes county sheriffs to request such information. Accordingly, Zergman contends that his failure to provide an accurate report of his locations was not a crime under RCW 9A.44.132(1)(b) and, therefore, the State provided insufficient evidence to prove failure to register as a sex offender. The State responds that it presented sufficient evidence and the plain language of RCW 9A.44.130(6)(b) contains a mandatory recordkeeping requirement, regardless of whether the Sheriff requested it for inspection.

We agree with the State. The plain language of the statute imposes a mandatory recordkeeping requirement on registrants, regardless of whether the Sheriff requests records for verification. Taking the State's evidence as true, sufficient evidence supported Zergman's conviction.

A. LEGAL PRINCIPLES

*i. Standard of Review*

To determine whether sufficient evidence supports a conviction, we determine whether any rational trier of fact could have found the essential elements of the charged crime beyond a

reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). We view the evidence and all reasonable inferences arising from the evidence in the light most favorable to the State. *Id.* at 265-66.

*ii. Recordkeeping Requirement Under RCW 9.41.130(6)(b)*

To convict a person of the crime of failure to register as a sex offender, the State must prove beyond a reasonable doubt that (1) the person has a duty to register and failed to do so under RCW 9A.44.130, (2) for a felony sex offense, and they (3) knowingly (4) fail to comply after (5) being convicted of felony failure to register on two or more occasions. RCW 9A.44.132(1)(b). As relevant here, the duty to register requires that:

> A person who lacks a fixed residence must report weekly, in person, to the sheriff of the county where he or she is registered. The weekly report shall be on a day specified by the county sheriff's office, and shall occur during normal business hours. *The person must keep an accurate accounting of where he or she stays* during the week and *provide it to the county sheriff upon request*.

RCW 9A.44.130(6)(b) (emphasis added).

B. APPLICATION

Zergman argues that the State presented insufficient evidence to convict him of failure to register as a sex offender because it did not identify a requirement of RCW 9A.44.130(6)(b) that he failed to comply with. In Zergman's view, the statute gives the county sheriff authority to request an accurate accounting of where Zergman stayed, but does not require Zergman to provide it. Therefore, by focusing exclusively on the inaccurate accounting, Zergman argues the State presented insufficient evidence to convict him of failure to register. We disagree.

11

Zergman's argument relies on *State v. Flowers*, 154 Wn. App. 462, 225 P.3d 476 (2010). *Flowers* interpreted an old version of the statute.[2] The plain language of current RCW 9A.44.130(6)(b) requires that a registrant do two things. First, the registrant must report weekly to their corresponding sheriff's department. Second, they must maintain an accurate accounting of where they stayed during the week, regardless of whether the sheriff requests that information. The statute puts the onus on the registrant to maintain an accurate accounting; failing to do so qualifies as a violation of the statute.

Taking the State's evidence as true—namely, the numerous witness' testimony that Zergman had not, as stated in his accounting provided to the sheriff, stayed in their residences—there was sufficient evidence to establish that Zergman failed to comply with his duty to report.

---

[2] In *Flowers*, the sheriff requested the transient defendant provide a list of places he had stayed during the week, but Flowers' list was neither accurate nor complete. 154 Wn. App at 464. The *Flowers* court held the statute did not require the Sheriff to collect information about where transient registrants stayed. *Id.* at 466. Therefore, a registrant's noncompliance with a sheriff's request did not constitute a statutory violation. *Id*. Shortly after *Flowers* was decided, the Washington Legislature amended the reporting requirement for transient offenders:

> A person who lacks a fixed residence must report weekly, in person, to the sheriff of the county where he or she is registered. The weekly report shall be on a day specified by the county sheriff's office, and shall occur during normal business hours. ((The county sheriff's office may require the person to list the locations where the person has stayed during the last seven days.)) The person must keep an accurate accounting of where he or she stays during the week and provide it to the county sheriff upon request.

LAWS OF 2010, ch. 265, § 1(6)(b), codified as RCW 9A.44.130(6)(b), effective June 10, 2010. Zergman contends that the amended statutory language similarly does not require he provide an accurate accounting of where he stayed because sheriffs are not obligated to request this information from registrants. We need not address the legislative history response because we determine the meaning of the statute by its plain language.

II. MISSING WITNESS INSTRUCTION

Zergman contends that the prosecutor committed misconduct by compelling him to opine on whether the State's primary witnesses were lying, that he received ineffective assistance of counsel when his attorney failed to object to the prosecutor's misconduct, and that the trial court erred in giving the missing witness instruction. As it relates to the missing witness instruction, Zergman argues that the trial court abused its discretion because McClary-Wise was not uniquely under Zergman's control and her testimony was not material. The State responds that the trial court carefully considered the instruction and correctly found that McClary-Wise was uniquely available to the Defendant.

We hold that the trial court erred in giving the missing witness instruction and the error was not harmless. Accordingly, we reverse and remand for a new trial. Our decision on the missing witness instruction makes it unnecessary for us to discuss the prosecutorial misconduct and ineffective assistance of counsel claims.

A. LEGAL PRINCIPLES

We review the trial court's decision about giving a missing witness instruction under an abuse of discretion standard. *State v. Montgomery*, 163 Wn.2d 577, 597, 183 P.3d 267 (2008). The trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds. *Id.*

Criminal defendants have no burden to present evidence. *Id.* at 597. "[T]he limitations on the missing witness doctrine are particularly important when, as here, the doctrine is applied against a criminal defendant." *Id*. at 598. The requirements for a missing witness instruction are sufficiently rigorous to make the doctrine rarely applicable in practice, especially in criminal cases.

5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 402.8, at 291 (6th ed. 2016). Nevertheless, Washington courts have affirmed that under the missing witness doctrine, the defendant's theory of the case is subject to the same scrutiny as the State's. *Montgomery*, 163 Wn.2d at 598.

Under the missing witness doctrine, the State (or the party seeking an instruction) can identify the absence of a natural witness when (1) the missing witness is within the defendant's control or "peculiarly" available to the defendant; (2) the defendant does not satisfactorily explain the witness' absence; (3) the inference would not infringe on the defendant's constitutional right to silence or shift the burden of proof; and (4) the witness' testimony would be material and not cumulative. *Id.* at 598-99. If any of these requirements is not met, use of the missing witness instruction is precluded. *See State v. Blair*, 117 Wn.2d 479, 488-490, 816 P.2d 718 (1991) (enumerating instances in which a missing witness doctrine does not apply). A natural witness is one that the party against whom the instruction is sought would have called if the facts known by the witness would have been favorable. *Id.* at 488.

A witness is within the defendant's control or uniquely available to the defendant when there is a community of interest or relationship between the defendant and the witness such that it would be reasonably probable for the defense to call the witness to testify unless their testimony would be damaging. *Id.* at 490. The missing witness doctrine does not apply if the uncalled witness is equally available to both parties. *Id*. Availability should not be conflated with whether the witness is in court or subject to subpoena power. *See id.* Rather, we determine whether there is peculiar control by considering if the relationship and influence of one party over the witness exceeds that of the other party. *See State v. Reed*, 168 Wn. App. 553, 572-73, 278 P.3d 203 (2012).

Unique or "peculiar" control arises when a defendant asserts a defense that involves a witness of which the State had no prior knowledge or the name of whom is " 'known to the defendant alone.' " *Id.* at 572 (quoting *Blair*, 117 Wn.2d at 490); *See also State v. Sundberg*, 185 Wn.2d 147, 148-50, 370 P.3d 1 (2016) (missing witness instruction appropriate when defendant asserted affirmative defense of unwitting possession of controlled substances and testified a man not previously mentioned to the State lent him overalls that contained the drugs); *Blair*, 117 Wn.2d at 491-92 (holding that the missing witness doctrine applied when defendant failed to call witnesses from what the State alleged were crib notes, but defendant testified were lists of personal loans).

## B. APPLICATION

Zergman argues the trial court erred in providing a missing witness instruction because McClary-Wise's testimony was not material and she was not uniquely under his control. We conclude that McClary-Wise's testimony was material, but she was not uniquely under the defendant's control. Therefore, we hold that the trial court abused its discretion by giving the missing witness instruction to the jury.

McClary-Wise's testimony was material and not cumulative for the same reasons she was a natural witness for both Zergman and the State. As Zergman's long-term partner, she had reason to know where and with whom Zergman stayed. She could have corroborated Zergman's testimony that he did not stay in her unit when the State's witnesses alleged he had, making her a natural witness for the defense. Though not called as a witness, McClary-Wise was a central subject of the State's case and therefore a natural witness. She was the only witness interviewed by Detective Stoppani that attested Zergman had stayed with other residents of Hilltop Ridge. The

State referenced not only her relationship to the other witnesses and defendant, but also prior communications and actions she had taken multiple times during trial. Given that both the State and the defense had reason to elicit her testimony, we turn to whether McClary-Wise was peculiarly available to Zergman.

As Zergman's fiancée and partner of five years, McClary-Wise was part of a well-established community of interest. For example, McClary-Wise applied for Zergman to be added to her lease agreement, requested letters from her neighbors to support Zergman's application, and allowed Zergman to regularly stay in her unit. Nevertheless, we conclude that McClary-Wise was not uniquely available to Zergman.

This is not a case where the defendant was the only party that knew of this witness and had exclusive or superior knowledge of what she would say if called to testify. The State was well aware of the testimony McClary-Wise could provide. Furthermore, the State knew that Zergman did not intend to call McClary-Wise as a witness and observed her sitting in the courtroom throughout the trial. Despite asserting the relevance of her testimony, the State chose not to call her as a witness in its case in chief. Though Zergman had a relationship with McClary-Wise, her prospective testimony was well-known to the State and central to the case of both parties. Given that she was equally available to both the State and Zergman, and both sides had an equal interest in calling her, the trial court abused its discretion in holding that the missing witness doctrine applied.

We conclude that the trial court abused its discretion when it gave a missing witness instruction that permitted the jury to draw a negative inference against Zergman based on his

decision not to call McClary-Wise as a witness because McClary-Wise was equally available to both parties and both parties had an equal interest in calling her as a witness.

C. CONSTITUTIONAL HARMLESS ERROR

An improper missing witness jury instruction is harmless if it appears beyond a reasonable doubt that the error did not contribute to the verdict, and "so long as the jury is properly instructed on the State's burden." *Montgomery*, 163 Wn.2d at 600. Harmless error depends on the facts of a particular case. *Id.*

This missing witness instruction was not harmless. The evidence in this case was not particularly strong in light of the inconsistent statements that were given by the witnesses. Moreover, the involvement of the witnesses' apartment manager, Ms. Johnson, in both preventing Zergman from living in the apartment complex and in preventing him from registering as a resident of Hilltop Ridge with the sheriff's department even though he *had* been living there, was apparent. Johnson's presence during the law enforcement interviews with the residents who testified at trial reinforces this concern.

Additionally, the State's decision not to call McClary-Wise is especially troubling in light of its impeachment of Schoville. The State was permitted to confront Schoville with an out-of-court statement allegedly from McClary-Wise, in which McClary-Wise, according to the State, seemingly provided Schoville with statements she wanted him to give law enforcement that would exculpate Zergman. Such a witness should have been of natural interest to the State, but the missing witness instruction allowed the jury to blame McClary-Wise's absence entirely on Zergman. The instruction allowed the jury to draw the inference that McClary-Wise's testimony would have only hurt Zergman.

We hold that the error in giving the missing witness instruction was not harmless and reverse and remand for a new trial.[3]

CONCLUSION

We hold that the State presented sufficient evidence to sustain Zergman's conviction for failure to register but the trial court erred in giving a missing witness instruction and the error was not harmless. We reverse and remand for a new trial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

---

[3] Although we need not separately address the claims of prosecutorial misconduct and ineffective assistance of counsel, we note that it is flagrant and ill-intentioned misconduct for a prosecutor to ask a criminal defendant whether a State's witness is lying. *State v. Cook*, 17 Wn. App. 2d 96, 107, 484 P.3d 13 (2021); *State v. Boehning*, 127 Wn. App. 511, 525, 111 P.3d 899 (2005). Although somewhat tempered by the fact that here, Zergman's theory of the case was that the State's witnesses from the Hilltop Ridge Apartments were lying in their testimony because they were under pressure to do so from the property manager, Ms. Johnson, the prosecutor's question were nevertheless improper.

Regarding the claim of ineffective assistance of counsel, defense counsel's performance was not deficient in this case. Although the prosecutor's line of questioning was improper, Zergman's trial strategy, again, was to persuade the jury that the witnesses' trial testimony was false because they feared reprisal from Johnson that could result in them losing their housing. *State v. Padilla*, 69 Wn. App. 295, 299, 846 P.2d 564 (1993). In light of Johnson's presence at each of the witnesses' interviews with law enforcement, this was a sound strategy even if it ultimately proved unsuccessful.

No. 59335-1-II

CRUSER, C.J.

We concur:

PRICE, J.

CHE, J.